## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICHOLAS STEBBINS, derivatively on behalf of MARINUS PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SCOTT BRAUNSTEIN, STEVEN PFANSTIEL, JOSEPH HULIHAN, CHARLES AUSTIN, ELAN EZICKSON, SETH H.Z. FISCHER, MARVIN H. JOHNSON, JR., TIM M. MAYLEBEN, SARASWATHY V. NOCHUR, SARAH NOONBERG, and CHRISTINE SILVERSTEIN, <br><br> Defendants, <br><br> and <br><br> MARINUS PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No.: 2:24-cv-06705 <br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Nicholas Stebbins ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Marinus Pharmaceuticals, Inc. ("Marinus" or the "Company"), files this Verified Shareholder Derivative Complaint against Scott Braunstein ("Braunstein"), Steven Pfanstiel ("Pfanstiel"), Joseph Hulihan ("Hulihan"), Charles Austin ("Austin"), Elan Ezickson ("Ezickson"), Seth H.Z. Fischer ("Fischer"), Marvin H. Johnson, Jr., ("Johnson"), Tim M. Mayleben ("Mayleben"), Saraswathy V. Nochur "(Nochur"), Sarah Noonberg ("Noonberg"), and Christine Silverstein ("Silverstein") (collectively, the "Individual Defendants," and together with Marinus, the "Defendants") for breaches of their fiduciary duties

1

as directors and/or officers of Marinus, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Marinus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action that seeks to remedy wrongdoing committed by Marinus's directors and officers from November 7, 2023 through May 8, 2024, both dates inclusive (the "Relevant Period").

2.       Marinus is a pharmaceutical company that develops commercial stage treatments for seizure disorders. The Company's primary product is its first U.S. Food and Drug Administration ("FDA") approved product, ZTALMY (ganaxolone), an oral suspension CV which is used to treat seizures associated with Cyclin-dependent Kinase-like 5 Deficiency Disorder.

3.       In the fall of 2019, the Company revealed positive results regarding its Phase 2 clinical trials evaluating intravenous ("IV") ganaxolone in patients being treated for Refractory Status Epilepticus ("RSE"). As a result, the Company began enrolling patients in a Phase 3 trial (dubbed "RAISE") to test the efficacy of this treatment.

4.      On November 7, 2023, the Company issued a press release (the "Q3 2023 Earnings Release") announcing its quarterly financial and operational results for the third quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"). The Q3 2023 Earnings Release also included an update on the RAISE trial, stating that more than "75% of patients required for the interim analysis are now enrolled in the Phase 3 RAISE trial in refractory status epilepticus; if the trial meets pre-defined stopping criteria at the interim analysis, topline data now anticipated Q2 2024." The Q3 2023 Earnings Release then quoted Defendant Braunstein, stating that the Company "remain[s] acutely focused on advancing our Phase 3 clinical trials in refractory status epilepticus and tuberous sclerosis complex." In addition, Defendant Braunstein stated that "[w]hile we're disappointed that we now project RAISE enrollment to conclude by the end of the first quarter, we remain confident in the benefit that IV ganaxolone could bring to critically ill RSE patients and the significant commercial opportunity." Defendant Braunstein then concluded that ""[w]e are ***committed to successfully completing both the RAISE and TrustTSC trials in 2024 and continue to make the investments to prepare for these commercial launches***."[1]

5.      Regarding the Company's cash position, the Q3 2023 Earnings Release stated an expectation "that cash, cash equivalents, and short-term investments of $176.4 million as of September 30, 2023, will be sufficient to fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024."

6.      On April 15, 2024, the truth began to emerge as the Company provided an interim analysis of the RAISE trial through a press release (the "April 2024 Update Press Release").  The April 2024 Update Press Release revealed that the drug failed to reach its "stopping criteria" as a

---

[1] All emphasis added unless stated otherwise.

result of the results failing to achieve both primary endpoints of the trial. As such, it was recommended that that the Company carry through the trial to final analysis.

7.      On this news, the Company's stock price declined $6.22 per share, or 82.7%, from a closing price at $7.52 per share on April 14, 2024, to $1.30 per share at the close of trading on April 15, 2024.

8.      The truth fully emerged on May 8, 2024, when the Company announced it was no longer enrolling patients in the RAISE trial, falling materially short of a full complement of 124 patients. The Company also announced that it would be firing 20% of its workforce, and that it was no longer investing money in IV ganaxolone manufacturing.

9.      On this news, the Company's stock price declined $0.14 per share, or 8.9%, from a closing price at $1.57 per share on May 7, 2024, to $1.43 per share at the close of trading on May 8, 2024.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the data for the RAISE trial was messy; (2) as a result, the Company needed to expend significant resources in order to clean it to uniformity; (3) the Company had been informed by November 7, 2023 to avoid an interim analysis due to the probability of meeting the enhanced criteria to stop the trial early; (4) to avoid this, the Company omitted any contradictory advice of senior staff as the Company did not have adequate resources to complete both the RAISE trial and the TrustTSC trial; (5) by not having adequate resources, the Company committed to end the trial

at the interim analysis anyway despite knowing it would fail to meet its primary endpoints; (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of a new Equity Incentive Plan (the "2024 EIP"); and (7) the Company did not have adequate internal controls over financial reporting. As a result, Marinus's statements were materially false and misleading at all relevant times.

11.     Additionally, Defendants Braunstein, Pfanstiel, and Hulihan breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the share price was artificially inflated because of their breaches of their fiduciary duties, resulting in aggregate personal proceeds of approximately $176,699.

12.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), and Chief Medical Officer ("CMO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in

this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of Marinus. Plaintiff has continuously held Marinus common stock since purchasing the stock on February 16, 2023.

### Nominal Defendant Marinus

19.     Marinus is a Delaware corporation with principal executive offices at 5 Radnor Corporate Center, Suite 500, 100 Matsonford Road, Radnor, PA, 19087. Marinus's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MRNS."

**Defendant Braunstein**

20.     Defendant Braunstein has been the Company's President, CEO, and a director since September 2018. In November 2022, he was also named to be Chair of the Board. According to the proxy statement filed on Schedule 14A with the SEC on April 4, 2024 (the "2024 Proxy Statement"), as of April 1, 2024, Defendant Braunstein beneficially owned 1,412,823 shares of Company common stock, which represents 2.51% of all outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Braunstein beneficially owned approximately $12.7 million worth of Marinus stock as of that date.

21.     For the 2023 Fiscal Year, Defendant Braunstein received $3,214,100 in total compensation from the Company. This included $650,000 in salary, $1,728,000 in option awards, $475,200 in stock awards, $351,000 in nonequity incentive plan compensation, and $9,900 in all other compensation.

22.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Braunstein made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 16, 2024 | 11,850 | $9.94 | $117,789 |

Thus, in total, before the fraud was exposed, Defendant Braunstein sold 11,850 shares of Company stock on inside information, for which he received approximately $117,789 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

23.     The 2024 Proxy Statement stated the following about Defendant Braunstein:

Dr. Braunstein was appointed Chair of our Board in November 2022 in addition to continuing as our Chief Executive Officer. He has served on our Board since September 2018. He was appointed Executive Chair of our Board in February 2019 and was appointed President and Chief Executive Officer in August 2019, at which time he remained on our Board but no longer as Executive Chair. Dr. Braunstein brings over 20 years of knowledge and experience from diverse biotechnology and pharmaceutical industry vantage points. He has served as an operating partner at Aisling Capital since 2015. From 2015 to 2018, he served as Senior Vice President, Strategy and Chief Operating Officer at Pacira Pharmaceuticals, Inc. (Nasdaq: PCRX), a specialty pharmaceutical company focused on the acute care setting. Prior to Pacira, he served as a healthcare portfolio manager at Everpoint Asset Management from 2014 to 2015 and spent 12 years with J.P. Morgan Asset Management as a healthcare analyst and managing director in the U.S. Equity team, and as portfolio manager of the JP Morgan Global Healthcare Fund responsible for managing investments in pharmaceuticals, biotechnology, and medical devices. Dr. Braunstein is currently on the board of directors of Caribou Biosciences, Inc. (Nasdaq: CRBU) and Trevena Inc. (Nasdaq: TRVN). Dr. Braunstein previously served on the boards of directors of Esperion Therapeutics, Inc. (Nasdaq: ESPR) (June 2015 to April 2020), Ziopharm Oncology Inc. (Nasdaq: ZIOP) (September 2018 to November 2020), Protara Therapeutics, Inc. (f/k/a ArTara Therapeutics, Inc.) (Nasdaq: TARA) (May 2018 to July 2020) and Constellation Pharmaceuticals, Inc. (formerly Nasdaq: CNST) (February 2018 to July 2021). Dr. Braunstein began his career as a practicing physician at the Summit Medical Group and as an assistant clinical professor at Albert Einstein College of Medicine and Columbia University Medical Center. He earned his medical degree from the Albert Einstein College of Medicine and his undergraduate degree at Cornell University.

**Skills and Qualifications**

Our Board believes Dr. Braunstein's extensive experience in the pharmaceutical industry and healthcare portfolio management, as well as his role as our president and chief executive officer and his knowledge of the company, qualifies him to serve on our Board.

**Defendant Pfanstiel**

24.     Defendant Pfanstiel has served as Marinus's CFO since April 2021, and as COO since January 2023. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant

Pfanstiel beneficially owned 307,153 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Pfanstiel beneficially owned approximately $2.8 million worth of Marinus stock as of that date.

25.    For the 2023 Fiscal Year, Defendant Pfanstiel received $1,444,950 in total compensation from the Company. This included $470,000 in salary, $607,608 in option awards, $167,092 in stock awards, $190,350 in nonequity incentive plan compensation, and $9,900 in all other compensation.

26.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Pfanstiel made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| February 16, 2024 | 3,092 | $9.97 | $30,827 |

Thus, in total, before the fraud was exposed, Defendant Pfanstiel sold 3,092 shares of Company stock on inside information, for which he received approximately $30,827 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

27.    The 2024 Proxy Statement states the following about Defendant Pfanstiel:

**Steven Pfanstiel, MBA, CMA** has served as our Chief Financial Officer since April 2021, and as our Chief Operating Officer since January 2023. Mr. Pfanstiel was appointed Chief Operating Officer on January 26, 2023, in addition to retaining his role as Chief Financial Officer. Mr. Pfanstiel previously served as Vice President, Finance, of LifeScan, Inc. (LifeScan), a diagnostic systems manufacturer with products focusing on the diabetes market, from January 2020 to March 2021, where he was responsible for supporting LifeScan's global commercial and development organizations, as well as its financial planning analysis function and treasury. Before LifeScan, Mr. Pfanstiel served as Senior Director of FP&A at

OptiNose, Inc. (OptiNose), a publicly traded specialty pharmaceutical company focused on creating and bringing to market innovative products for patients with diseases treated by ear, nose, and throat and allergy specialists, from February 2018 to January 2020. During his time at OptiNose, Mr. Pfanstiel served as finance leader for the supply chain, R&D and clinical organizations and was responsible for the broader strategic finance analysis across the organization. From July 2016 to February 2018, Mr. Pfanstiel served as Senior Director supporting Global Strategic Marketing for the DePuy Synthes Companies, a franchise of orthopedic and neurosurgery companies owned by Johnson & Johnson, where he provided financial leadership to the Global Orthopedics franchise and served as a member of the Orthopedics Global Management Board. From November 2013 to July 2016, Mr. Pfanstiel service as Senior Director supporting North America Commercial, Worldwide Financial Reporting, Strategic Marketing and R&D, for Animas Corporation and LifeScan, members of the Johnson & Johnson Family of Diabetes Companies, where he led the finance team transformation and implementation of a new business strategy with the diabetes leadership team. Earlier in his career, Mr. Pfanstiel held various finance positions for Johnson & Johnson, Janssen R&D and Ethicon Endo-Surgery. Mr. Pfanstiel received his B.A. in Physics from Wabash College, his M.S. in Environmental Systems Engineering from Clemson University and his MBA from Indiana University, Kelley School of Business.

### **Defendant Hulihan**

28.    Defendant Hulihan has served as Marinus's CMO since October 2019. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Hulihan beneficially owned 448,753 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Hulihan beneficially owned approximately $4 million worth of Marinus stock as of that date.

29.    For the 2023 Fiscal Year, Defendant Hulihan received $1,371,950 in total compensation from the Company. This included $482,040 in salary, $554,006 in option awards, $152,349 in stock awards, $173,534 in nonequity incentive plan compensation, and $9,900 in all other compensation.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hulihan made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|-----------------|-----------------|----------|
| February 16, 2024 | 2,814 | $9.98 | $28,083 |

Thus, in total, before the fraud was exposed, Defendant Hulihan sold 2,814 shares of Company stock on inside information, for which he received approximately $28,083 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

31.    The 2024 Proxy Statement states the following about Defendant Hulihan:

Joseph Hulihan, M.D. has served as our Chief Medical Officer since October 2019. Dr. Hulihan brings close to 30 years of experience in clinical drug development, medical affairs and research in numerous conditions in neurology and psychiatry including epilepsy, ADHD, schizophrenia and mood disorders. He is a board-certified neurologist and clinical neurophysiologist. He was principal at Paradigm Neuroscience from 2015 until September 2019, where he provided consulting services including clinical and strategic support for neurotherapeutics in all phases of development. Prior to that, Dr. Hulihan spent 15 years at Johnson & Johnson in roles of increasing responsibility with a primary focus on neurology and psychiatry. Most recently he served as Global Medical Affairs Leader, Neuroscience (mood disorders) at Janssen Global Services, LLC. Other roles included Vice President, CNS Medical Affairs at Janssen and Director, CNS Research, Clinical Affairs at Ortho-McNeil Pharmaceutical. Dr. Hulihan has served as a principal investigator, member of the clinical development team, group supervisor, and study physician on more than 25 late-stage CNS focused clinical trials and authored more than 70 published papers. He received his medical degree from Drexel University School of Medicine, with Honors in Neurology.

**Defendant Austin**

32.    Defendant Austin served as a director from July 2020 until stepping down from the Board in November 2024. While he was a director, Defendant Austin served as the Chair of the Science & Technology Committee and as a member of the Nominating & Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Austin beneficially owned 82,319 shares of Company common stock. Given that the price per share of

the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Austin

beneficially owned approximately $738,401 worth of Marinus stock as of that date.

33.    For the 2023 Fiscal Year, Defendant Austin received $157,524 in total

compensation from the Company. This included $60,000 in fees earned or paid in cash, $76,140

in option awards, and $21,384 in stock awards.

34.    The 2024 Proxy Statement stated the following about Defendant Austin:

Mr. Austin has served on our Board since July 2020. Mr. Austin has more than
25 years of experience in the life sciences sector. He was with Johnson & Johnson
for 26 years and retired in March 2014. During his tenure at Johnson & Johnson,
he held numerous roles in supply chain operations, research and development, and
engineering. Most recently, Mr. Austin served as Corporate Vice President, Global
Supply Chain at Johnson & Johnson, where he was a member of the Johnson &
Johnson Management Committee and was responsible for all manufacturing,
logistics, quality, compliance, direct procurement, environmental, health and
safety, and engineering and real estate for the corporation. He served as Company
Group Chair of Ethicon Surgical Care, a Johnson & Johnson Company, where he
helped combine four separate operating units and re-engineer a global commercial
model. Mr. Austin currently serves on two private company boards in the medical
and consumer spaces and is a principal in JKA Consulting, a San Diego-based firm
focused on the medical space. Mr. Austin obtained a Bachelor of Science in
Engineering from the United States Military Academy, West Point, New York, and
served in the United States Army for over nine years.

**Skills and Qualifications**

Our Board believes Mr. Austin's extensive experience in the life sciences industry,
including in commercial, research, pharmaceutical operations, manufacturing,
supply chain, logistics, quality and compliance qualifies him to serve on our Board.

**Defendant Ezickson**

35.    Defendant Ezickson has served as a director since December 2019. He also serves

as the Chair of the Nominating & Corporate Governance Committee and as a member of the Audit

Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Ezickson

beneficially owned 82,642 shares of Company common stock. Given that the price per share of

the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant

Ezickson beneficially owned approximately $741,299 worth of Marinus stock as of that date.

36.    For the 2023 Fiscal Year, Defendant Ezickson received $162,524 in total

compensation from the Company. This included $65,000 in fees earned or paid in cash, $76,140

in option awards, and $21,384 in stock awards.

37.    The 2024 Proxy Statement stated the following about Defendant Ezickson:

Mr. Ezickson has served on our Board since December 2019. Mr. Ezickson brings
extensive biopharmaceutical operational, strategic and capital formation expertise
to our Board. From August 2020 to March 2021, Mr. Ezickson served as the
Founding CEO and member of the Board of Sporos Bioventures (Sporos), a private
biotechnology company dedicated to developing a pipeline of innovative
therapeutics in the fields of oncology and immunology. Prior to Sporos, he served
as the Chief Operating Officer and head of corporate development at Scholar Rock
Holding Corporation (Nasdaq: SRRK) (Scholar Rock), a clinical stage
biotechnology company focused on novel oncology and rare disease treatments,
from August 2014 until his retirement from Scholar Rock in December 2018. At
Scholar Rock, Mr. Ezickson directed corporate development, operations and
strategy, and played a significant role in corporate finance, leading the company's
initial public offering. Prior to joining Scholar Rock, Mr. Ezickson served as
Executive Vice President and Chief Operating Officer of AVEO
Pharmaceuticals, Inc. (Nasdaq: AVEO) (AVEO). Prior to AVEO, Mr. Ezickson
was at Biogen Inc. (Nasdaq: BIIB) in roles that included President of Biogen
Canada, Program Executive and Associate General Counsel. Mr. Ezickson
currently serves on the board of directors of Carmine Therapeutics, a private
biotechnology company pioneering a new class of gene therapies. Mr. Ezickson
served on the board of directors of Ziopharm Oncology Inc. (Nasdaq: ZIOP), a
clinical stage biotechnology company, from September 2018 to December 2020.
Mr. Ezickson holds a Bachelor of Arts degree in political science from Yale
University and a Juris Doctorate from the Columbia University School of Law.

**Skills and Qualifications**

Our Board believes Mr. Ezickson's extensive biopharmaceutical experience in
operations, commercial, corporate development, strategy and capital formation
qualifies him to serve on our Board.

**<u>Defendant Fischer</u>**

38.    Defendant Fischer has served as a director since December 2019. He also serves as

a member of the Audit Committee, the Compensation Committee, and the Commercial Committee.

According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Fischer beneficially owned 107,043 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Fischer beneficially owned approximately $960,176 worth of Marinus stock as of that date.

39.    For the 2023 Fiscal Year, Defendant Fischer received $160,024 in total compensation from the Company. This included $62,500 in fees earned or paid in cash, $76,140 in option awards, and $21,384 in stock awards.

40.    The 2024 Proxy Statement stated the following about Defendant Fischer:

Mr. Fischer has served on our Board since September 2016. Mr. Fischer currently serves as a member of the board of directors of Agile Therapeutics Inc. (Nasdaq: AGRX), Milestone Pharmaceuticals, Inc. (Nasdaq: MIST), and Esperion Therapeutics, Inc. (Nasdaq: ESPR). Mr. Fischer previously served on the board of directors of BioSig Technologies Inc. (Nasdaq: BSGM) (May 2013 to May 2019); and Spectrum Pharmaceuticals, Inc. (Nasdaq: SPPI) ( April 2020 through July 2023). Mr. Fischer previously served as the Chief Executive Officer and as a Director of Vivus, Inc. (formerly Nasdaq: VVUS), a biopharmaceutical company commercializing and developing therapies to address unmet needs in obesity, diabetes, sleep apnea and sexual health (September 2013 to December 2017). Prior to Vivus, Mr. Fischer served in various positions of increasing responsibility with Johnson & Johnson from 1983 until his retirement in 2012. Most recently, Mr. Fischer served as Company Group Chair, Johnson & Johnson and Worldwide Franchise Chair, Cordis Corporation from 2008 to 2012, and as Company Group Chair, North America Pharmaceuticals from 2004 to 2007, which included responsibilities for Ortho-McNeil Pharmaceuticals, Janssen and Scios. Prior to that, Mr. Fischer served as President of Ortho-McNeil Pharmaceuticals from 2000 to 2004. His operating responsibilities encompassed the commercialization of products in multiple therapeutic categories including Topamax® for epilepsy and migraine and products in the analgesic, anti-infective, cardiovascular, neurologic, psychiatric and women's health areas. He earned a Bachelor of General Studies from Ohio University and served as a captain in the U.S. Air Force.

**Skills and Qualifications**

Our Board believes Mr. Fischer's experience in pharmaceutical operations and commercialization in a wide range of therapeutics, including in epilepsy and migraines, qualifies him to serve on our Board.

**<u>Defendant Johnson</u>**

41.    Defendant Johnson has served as a director since April 2023. He also serves as the Chair of the Compensation Committee and as a member of the Commercial Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Johnson beneficially owned 21,066 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Johnson beneficially owned approximately $188,692 worth of Marinus stock as of that date.

42.    For the 2023 Fiscal Year, Defendant Johnson received $304,812 in total compensation from the Company. This included $37,188 in fees earned or paid in cash, $209,952 in option awards, and $57,672 in stock awards.

43.    The 2024 Proxy Statement stated the following about Defendant Johnson:

Mr. Johnson has served on our Board since April 2023. Mr. Johnson's professional experience included over 34 years at Merck & Co., predominantly in the area of commercial operations, that spanned a diverse and increasing set of responsibilities. Mr. Johnson held Senior Sales and Marketing leadership positions across multiple therapeutic categories including Diabetes, Acute Care, Neurology, Respiratory, Cardiovascular, Pain Management and Sleep Disorders. His experiences have included leading large-scale regional, national and global sales and marketing organizations worth over $3 billion in revenue, and he has extensive experience launching products in the U.S and abroad. Mr. Johnson was most recently Chief Learning Officer at Merck from 2016 until his retirement in October 2018. Mr. Johnson currently serves on the Board of Trevena, Inc. (Nasdaq: TRVN) which he joined in March 2021. Mr. Johnson is also the Chair on the Board of Trustees for Tabor Children's Services, Inc., a nonprofit child welfare agency where he has served as a board member since 2014. Mr. Johnson also serves on the Pennsylvania State University Abington Campus Advisory Board. Since December 2018, Mr. Johnson has also served on the strategic advisory board for GP Strategies Corporation, a global workforce transformation learning solutions provider.

**Skills and Qualifications**

Our Board believes Mr. Johnson's extensive experience in the life sciences industry, including commercial operations, marketing, national and global sales organizations, product launches, and pharmaceutical operations qualifies him to serve on our Board.

**<u>Defendant Mayleben</u>**

44.     Defendant Mayleben has served as a director since December 2008. He also serves as the Lead Independent Director and as a member of the Audit Committee and Compensation Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Mayleben beneficially owned 119,642 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Mayleben beneficially owned approximately $1.1 million worth of Marinus stock as of that date.

45.     For the 2023 Fiscal Year, Defendant Mayleben received $202,524 in total compensation from the Company. This included $105,000 in fees earned or paid in cash, $76,140 in option awards, and $21,384 in stock awards.

46.     The 2024 Proxy Statement stated the following about Defendant Mayleben:

Mr. Mayleben has served on our Board since December 2008 and as our Lead Independent Director since November 2022. He previously served as our Lead Independent Director from June 2017 to February 2019. Mr. Mayleben currently serves as president of a private biopharma company. Previously, Mr. Mayleben served as interim President and Chief Executive Officer of Landos Biopharma, Inc. (Landos) (Nasdaq: LABP), a clinical-stage biopharmaceutical company, from November 2021 until June 2022. From December 2012 until May 2021, Mr. Mayleben served as President, Chief Executive Officer and a director of Esperion Therapeutics, Inc. (Nasdaq: ESPR), a pharmaceutical company focused on the development and commercialization of therapies for the treatment of elevated levels of LDL-cholesterol. Mr. Mayleben has more than two decades of executive leadership experience in the life sciences industry, including as former President, Chief Executive Officer and a director of Vericel Corporation (formerly Aastrom Biosciences, Inc.) (Nasdaq: VCEL), former President, Chief Operating Officer and a director of Virtual Radiologics, Inc. (formerly NightHawk Radiology Holdings, Inc.) and former Chief Operating Officer and Chief Financial Officer of the original Esperion Therapeutics, Inc. until its acquisition by Pfizer, Inc. (NYSE: PFE) in 2004. Mr. Mayleben currently serves on the board of Landos and on the business advisory board for Phlow Corporation. His previous experience includes serving on the boards of Kaleo, LOXO Oncology, NightHawk, and a number of private biopharma companies. Mr. Mayleben earned an M.B.A. with distinction, from the J.L. Kellogg Graduate School of Management at Northwestern University, and a B.B.A. from the University of Michigan, Ross School of Business.

**Skills and Qualifications**

Our Board believes Mr. Mayleben's experience in the life sciences industry, including his prior experience serving as an executive and director of public companies in the pharmaceutical and biotechnology industries and his qualifications as a financial expert, qualifies him to serve on our Board.

**Defendant Nochur**

47.    Defendant Nochur served as a director from March 2021 until stepping down from the Board in November 2024. While she was a director, Defendant Nochur served as a member of the Science & Technology Committee and the Nominating & Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Nochur beneficially owned 74,892 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Nochur beneficially owned approximately $671,781 worth of Marinus stock as of that date.

48.    For the 2023 Fiscal Year, Defendant Nochur received $154,743 in total compensation from the Company. This included $57,219 in fees earned or paid in cash, $76,140 in option awards, and $21,384 in stock awards.

49.    The 2024 Proxy Statement stated the following about Defendant Nochur:

Dr. Nochur has served on our Board since March 2021. She joined Alnylam Pharmaceuticals, Inc. (Nasdaq: ALNY) as Vice President and Head of Regulatory Affairs in 2006 and rose to Chief Regulatory Officer in March 2018, a role she held until December 2020, while also a member of the Management Board of Alnylam. Since January 2021, she has served as Chief Diversity, Equity and Inclusion Officer for Alnylam. Prior to joining Alnylam, Dr. Nochur was employed by the Medicines Company in regulatory affairs where she rose to the position of Vice President of Regulatory Affairs. Dr. Nochur sat on the board of Decibel Therapeutics Inc. (Nasdaq: DBTX), a gene therapy company focused on hearing loss and balance disorders from December 2021 until its acquisition by Regeneron Pharmaceuticals which was completed in September 2023. She has served as host and a member of the board of Hospitality Homes, a non-profit organization that provides free or low-cost short-term housing in volunteer host homes or apartments for families and friends of patients seeking specialty care at Boston-area healthcare organizations. Dr. Nochur is also a member of the board of Biomedical Science Careers Program, a non-profit organization that promotes careers in science for students from under-represented communities. She received her B.S.in Microbiology and Chemistry and M.S. in Microbiology

from the University of Bombay, India and her Ph.D. in Biochemical Engineering at the Massachusetts Institute of Technology, Cambridge, MA.

**Skills and Qualifications**

Our Board believes Dr. Nochur's experience in the life sciences industry, including her extensive experience in drug development and the regulatory approval process, qualifies her to serve on our Board.

**<u>Defendant Noonberg</u>**

50.    Defendant Noonberg served as a director from May 2023 until stepping down from the Board in November 2024. While she was a director, Defendant Noonberg served as a member of the Science & Technology Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Noonberg beneficially owned 20,166 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Noonberg beneficially owned approximately $180,889 worth of Marinus stock as of that date.

51.    For the 2023 Fiscal Year, Defendant Noonberg received $315,201 in total compensation from the Company. This included $31,341 in fees earned or paid in cash, $222,588 in option awards, and $61,272 in stock awards.

52.    The 2024 Proxy Statement stated the following about Defendant Noonberg:

Sarah B. Noonberg, M.D., Ph.D., has served on our Board since May 2023. She currently serves as the Chief Medical Officer of Metagenomi, a next generation gene editing biotechnology company. Previously, from September 2020 to September 2022, Dr. Noonberg was the Chief Medical Officer of Maze Therapeutics, a human-genetics driven research and development company, and from May 2018 to May 2019, Dr. Noonberg served as the Chief Medical Officer of Nohla Therapeutics Inc., a developer of universal, off-the-shelf cell therapies for patients with hematological malignancies and other critical diseases. Prior to joining Nohla Therapeutics, she served as the Chief Medical Officer of Prothena Corporation plc, a biotechnology company, from May 2017 to May 2018. Dr. Noonberg previously served as Group Vice President and Head of Global Clinical Development at BioMarin Pharmaceuticals Inc., a biotechnology company from August 2015 to March 2017. From May 2007 to August 2015, she held several positions at Medivation, Inc., a biopharmaceutical company,

culminating in the position of Senior Vice President of Early Development. She is currently on the board of directors of Neurogene (Nasdaq: NGNE) which she joined in December 2023 and previously served on the board of directors of Protagonist Therapeutics (Nasdaq: PTGX) from December 2017 to May 2023 and Neoleukin Therapeutics (Nasdaq: NLTX) from August 2019 to December 2023. Dr. Noonberg received her M.D. at the University of California, San Francisco, her Ph.D. in Bioengineering at the University of California, Berkeley, and her bachelor's degree in Engineering at Dartmouth College. She received board certification in internal medicine and completed her residence at Johns Hopkins Hospital.

**Skills and Qualifications**

Our Board believes Dr. Noonberg's diverse background in translational science, clinical development, medical affairs, and corporate governance qualifies her to serve on our Board.

**<u>Defendant Silverstein</u>**

53.    Defendant Silverstein has served as a director since January 2023. She also serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Silverstein beneficially owned 23,766 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $8.97, Defendant Silverstein beneficially owned approximately $213,181 worth of Marinus stock as of that date.

54.    For the 2023 Fiscal Year, Defendant Silverstein received $249,214 in total compensation from the Company. This included $51,250 in fees earned or paid in cash, $155,196 in option awards, and $42,768 in stock awards.

55.    The 2024 Proxy Statement stated the following about Defendant Silverstein:

Ms. Silverstein has served on our Board since January 2023. Since February 2024, Ms. Silverstein has served as Chief Financial Officer of Artios Pharma, a private precision oncology company. From May 2021 to January 2024, Ms. Silverstein served as Chief Financial Officer of Excision Biotherapeutics, Inc., a clinical-stage biotechnology company developing CRISPR-based therapies. From July 2020 to January 2021, Ms. Silverstein served as Chief Financial Officer of Emendo Biotherapeutics Inc., a gene-editing company that was acquired in December 2020 by AnGes, Inc. Since March 2020,

Ms. Silverstein has served as a member of the board of directors for Abeona Therapeutics Inc. (Nasdaq: ABEO) ("Abeona"), a clinical-stage biopharmaceutical company developing cell and gene therapies for rare pediatric diseases. Ms. Silverstein previously operated in various senior executive corporate finance roles within Abeona, including Chief Financial Officer from January 2019 to March 2020, Senior Vice President, Finance & Strategy from May 2018 to December 2018 and Vice President, Finance & Investor Relations from April 2016 to May 2018. Prior to joining Abeona in 2016, from 2014 to 2016, she served as Head of Investor Relations at Relmada Therapeutics, Inc. (Nasdaq: RLMD), a late-stage biotechnology company addressing diseases of the central nervous system. Ms. Silverstein previously served in senior executive roles within a biotechnology venture fund and various capital markets advisory firms. Ms. Silverstein began her career in financial services as an investment advisor at Royal Alliance Associates before moving to the biotechnology industry. She is a member of CHIEF, Deloitte's Chief Financial Officer Program, Women in Bio and the National Investor Relations Institute. Ms. Silverstein holds a Bachelor of Science from the Peter Tobin College of Business at St. John's University and earned various accreditations from the Financial Industry Regulatory Authority (FINRA).

**Skills and Qualifications**

Our Board believes Ms. Silverstein's experience in the biotechnology industry, including her career in the finance sector working with U.S. public companies and capital markets, as well as her experience with financial strategies and transactions, audit, compliance and crisis management as well as her qualifications as a financial expert qualifies her to serve on our Board.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

56.    By reason of their positions as officers, directors, and/or fiduciaries of Marinus and because of their ability to control the business and corporate affairs of Marinus, the Individual Defendants owed Marinus and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Marinus in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Marinus and its shareholders so as to benefit all shareholders equally.

57.    Each director and officer of the Company owes to Marinus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Marinus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.    To discharge their duties, the officers and directors of Marinus were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Marinus, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Marinus's Board at all relevant times.

61.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.     To discharge their duties, the officers and directors of Marinus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Marinus were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Marinus's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Marinus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Marinus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Marinus's operations would comply with all applicable laws and Marinus's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.      Each of the Individual Defendants further owed to Marinus and the shareholders the duty of loyalty requiring that each favor Marinus's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Marinus and were at all times acting within the course and scope of such agency.

65.    Because of their advisory, executive, managerial, directorial, and controlling positions with Marinus, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Marinus.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

69.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Marinus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Marinus and was at all times acting within the course and scope of such agency.

**Relevant Non-Parties**

72.    The Securities Class Action captioned *Bishins v. Marinus Pharmaceuticals, Inc., et al.*, No. 2:24-cv-02430-JP, in the United States District Court for the Eastern District of Pennsylvania, incorporates statements from former employees of Marinus who offered their experiences confidentially. The following are the former employees whose statements are referenced throughout this complaint before this Court.

**FE1**

73.    FE1 worked for Marinus as a Senior Vice President of Biometrics from September 2020 through September 2024. In this role, FE1 oversaw the design, conduct, and analysis of the Company's clinical trials for regulatory approval. FE1 reported directly to Defendant Hulihan and led a team of statisticians and programmers who worked on the RAISE trial. FE1 participated in

the study design, the interpretation of the study's data, preparing the reports on the study, and advising leadership on the study's status. The project statistician and programmer for the RAISE trial reported to FE1.

**FE2**

74.     FE2 worked for Marinus as a Director of Clinical Development Operations. FE2 reported to Kathleen Cohen, Marinus's Vice President of Clinical Development Operations, who reported to Defendant Braunstein.

**FE3**

75.     FE3 worked for Marinus as a Senior Clinical Trial Manager from August 2023 through April 2024. FE3 reported to FE2.

<u>**MARINUS'S CODE OF ETHICS**</u>

***Code of Ethics***

76.     According to the Company's Code of Ethics, the Code of Ethics "is designed to provide helpful general principles, it is not intended to address every specific situation. Nevertheless, in every instance, personnel of the Company should act honestly, fairly, and with a view towards "doing the right thing." Therefore, dishonest or unethical conduct or conduct that is illegal will constitute a violation of this Code, regardless of whether such conduct is specifically referenced in this Code."

77.     The Code of Ethics claims that "[a]ll directors, officers and employees of the Company are expected to be familiar with this Code and to adhere to those principles and procedures set forth in this Code that apply to them."

78.     The Board represents that it adopted the Code of Ethics to:

- promote honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") and in other public communications the Company makes;

- promote compliance with applicable laws and governmental rules and regulations;

- promote the prompt internal reporting of violations of this Code as described in this Code and accountability for adherence to this Code;

- ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and

- deter wrongdoing.

79.    In a section titled "Honest and Ethical Conduct," the Code of Ethics states the following:

Each director, officer and employee owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest and ethical.

Each director, officer and employee must:

- act with integrity, including being honest and ethical while still maintaining the confidentiality of information where required or consistent with the Company's policies;

- observe both the form and spirit of laws and governmental rules and regulations, accounting standards and Company policies; and

- adhere to a high standard of business ethics.

80.    In a section titled "Disclosure," the Code of Ethics states the following:

Each director, officer and employee involved in the Company's disclosure process, including the Senior Officers, is required to be familiar with and comply with the Company's disclosure controls and procedures and internal control over financial reporting, to the extent relevant to his or her area of responsibility, so that the Company's public reports and documents filed with the SEC comply in all material respects with the applicable federal securities laws and SEC rules. In addition, each such person having direct or supervisory authority regarding these SEC filings or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his or her area of responsibility, consult with other Company officers and

employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

Each director, officer or employee who is involved in the Company's disclosure process, including without limitation the Senior Officers, must:

- familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company;

- not override, or direct others to override, the Company's established system of internal control over financial reporting or the Company's disclosure controls and procedures;

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accounting firm, governmental regulators and self-regulatory organizations;

- execute all transactions of the Company only in accordance with management's general or specific authorizations;

- properly review and critically analyze proposed disclosure for accuracy and completeness (or, where appropriate, delegate this task to others); and

- provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely and understandable disclosure in reports and documents filed with or submitted to the SEC or used in other public communications by the Company.

81. In a section titled "Compliance with Laws," the Code of Ethics states the following,

in relevant part:

All directors, officers and employees of the Company should respect and comply with all of the laws, rules and regulations of the United States, state and local governments and the governments of foreign countries in which the Company conducts its business or any other laws, rules and regulations that are applicable to the Company. Such legal compliance should include, without limitation, compliance with the "insider trading" prohibitions applicable to the Company and its employees, officers and directors. Please refer to "XIII. Insider Trading" below for a discussion of insider trading.

In accordance with Federal law, the Company has a policy against making any loans to any officer or director of the Company, whether directly or indirectly, or guaranteeing any loan or obligation on behalf of any officer or director.

This Code does not summarize all laws, rules and regulations applicable to the Company and its employees, officers and directors. Please consult with one of the Senior Officers with any specific questions regarding compliance with laws. Any violations of laws, rules and regulations can result in civil and criminal penalties as well as disciplinary action by the Company.

82.     In a section titled "Research and Development; Regulatory Compliance," the Code

of Ethics states the following:

The research and development of pharmaceutical products is subject to a number of legal and regulatory requirements, including standards related to ethical research procedures and proper scientific conduct. The Company expects employees to comply with all such requirements.

83.     In a section titled "Insider Trading," the Code of Ethics states the following:

Consistent with the laws of the United States and many other countries prohibiting trading in the securities of any company while in possession of material, non-public information (also known as "inside information"), trading of the securities of the Company in such manner is expressly prohibited. Any trading in the Company's securities must be in accordance with the Company's Insider Trading Policy adopted by the Board. A copy of the Insider Trading Policy has been provided to each director, officer and employee of the Company and is available upon request.

### *Corporate Governance Guidelines*

84.     The Board also maintains a set of Corporate Governance Guidelines "to assist the

Board in carrying out its oversight responsibilities and to serve the best interests of the Company

and its stockholders."

85.     Under the heading "The Role of the Board of Directors," in a subsection titled

"Fiduciary Duties of the Directors," the Corporate Governance Guidelines state:

The members of the Board are elected by the stockholders of the Company to oversee, and provide strategic guidance to, senior management of the Company. As a director, each Board member stands in a fiduciary relationship to the Company and its stockholders. As such, each director is required to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

86.     Under the same heading, in a subsection titled "Primary Responsibilities of the Board," the Corporate Governance Guidelines state:

> The business and affairs of the Company are managed by or under the direction of the Board, acting on behalf of the stockholders. The Board has delegated to the officers of the Company the authority and responsibility for managing the Company's day-to-day affairs. The Board has an oversight role and is not expected to perform or duplicate the tasks of the Chief Executive Officer ("CEO") or senior management. The Board may delegate its responsibilities to the Committees of the Board.

87.     Under the same heading, in a subsection titled "Legal and Ethical Conduct," the Corporate Governance Guidelines state:

> The Board is committed to legal and ethical conduct in fulfilling its responsibilities. The Board expects all directors, as well as officers and employees of the Company, to adhere to the Company's Code of Business Conduct and Ethics.

88.     Under the heading "Other Matters," in a subsection titled "Risk Oversight, Assessment and Management," the Corporate Governance Guidelines state:

> The Board and the appropriate Committees shall consider and periodically discuss with management the Company's policies and procedures with respect to risk oversight, assessment and management.

89.     In violation of the Code of Ethics and Corporate Governance Guidelines, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

90.    In further breach of the Code of Ethics, specifically the "Insider Trading" section, Defendants Braunstein, Pfanstiel, and Hulihan breached their fiduciary duty by engaging in lucrative insider sales of Company common stock while the price was artificially inflated, resulting in combined proceeds of approximately $176,699.

## AUDIT COMMITTEE CHARTER

91.    The Company also maintains an Audit Committee Charter. Under a section titled "Authority and Purpose," the Audit Committee Charter states:

> The Board of Directors (the "Board") of Marinus Pharmaceuticals, Inc. (the "Company") has established an Audit Committee (the "Committee") to oversee: (a) the Company's accounting and financial reporting processes, including the oversight of the financial reports and other financial information provided by the Company to any governmental or regulatory body, the public or others who rely thereon; (b) the Company's internal control over financial reporting and, if applicable, the annual audit of the effectiveness of the Company's internal control over financial reporting; (c) the selection, evaluation and retention of the Company's independent registered public accounting firm; (d) the qualifications, independence, engagement and performance of the Company's independent registered public accounting firm; (e) the integrity of and annual independent audit of the Company's financial statements under generally accepted accounting principles ("GAAP"); (f) the Company's risk assessment, risk management and risk mitigation policies and programs, including matters relating to privacy and cybersecurity; and (g) compliance by the Company with the rules and regulations of the Securities and Exchange Commission (the "SEC") and any other applicable legal or regulatory requirements (the "applicable rules") and the listing standards of The Nasdaq Stock Market LLC ("Nasdaq") or such other national securities exchange on which the Company's securities are then listed, as the same may be amended from time to time (the "listing standards").

92.    Under the Heading "Authority and Responsibilities," in a subsection titled "Financial Statements and Disclosure Matters" the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

> (a)    Meet to review and discuss with management and the independent registered public accounting firm the annual audited financial statements and quarterly financial statements prior to the Company's issuing its quarterly or year-end earnings release, as applicable, and filing such financial statements with the SEC, including reviewing the specific disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and

recommend to the Board whether the audited financial statements and the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Annual Report Form 10-K to be filed with the SEC.

(b)     Discuss with management and the independent registered public accounting firm any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, critical audit matters and any major issues regarding accounting principles and financial statement presentations.

(c)     Effect or cause to be effected any revisions to the Company's financial statements that the Committee deems necessary or advisable after consultation with the Company's independent registered public accounting firm or the Committee's advisors.

(d)     Review and discuss quarterly reports from the independent registered public accounting firm regarding:

    (i)     all critical accounting policies and practices to be used;

    (ii)     all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm; and

    (iii)     other material written communications between the independent registered public accounting firm and management such as any management letter or schedule or unadjusted differences.

(e)     Discuss with management and the independent registered public accounting firm the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

(f)     Discuss with the independent registered public accounting firm all other matters that are required to be communicated to, or discussed with, the Committee under Public Company Accounting Oversight Board ("PCAOB") and SEC rules.

(g)     Review the Company's procedures for monitoring compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws.

(h)     Oversee the Company's finance function, which may include the periodic review of the Company's investment policy.

(i)     Oversee the Company's cybersecurity disclosure process, which may include the periodic review of the Company's IT Security Incidence Response procedure.

(j)    Meet separately and periodically with management of the Company, the employees of the Company responsible for the internal audit, as applicable, and the Company's independent registered public accounting firm.

93.    Under the same heading, in a subsection titled "Oversight of the Company's Relationship with the Independent Registered Public Accounting Firm" the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

(k)    Appoint, retain, compensate, evaluate and, as necessary, terminate the Company's independent registered public accounting firm.

(l)    Review the qualifications and evaluate the performance of the independent registered public accounting firm.

(m)    Approve all audit engagement fees and terms.

(n)    Oversee the work of the independent registered public accounting firm (including resolution of disagreements between management and the independent registered public accounting firm regarding financial reporting) for the purpose of preparing or issuing an audit report or performing related work. The independent registered public accounting firm will ultimately be accountable to the Board and report directly to the Committee.

(o)    Pre-approve, or establish and maintain an appropriate policy governing the preapproval of, all auditing services and permitted non-audit services (including the fees and terms thereof) to be performed for the Company by its independent registered public accounting firm, in accordance with in Section 10A of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and SEC rules. The Committee shall periodically review the appropriateness and effectiveness of any such pre-approval policy.

(p)    Review the experience and qualifications of the senior members of the independent registered public accounting firm's team.

(q)    Obtain and review a formal, written report from the independent registered public accounting firm at least annually regarding (i) the independent registered public accounting firm's internal quality control procedures, (ii) any material issues raised by the most recent internal quality control review, or peer review, of the independent registered public accounting firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the independent registered public accounting firm, (iii) any steps taken to deal with any such issues, and (iv) all relationships between the independent registered public accounting firm and the Company, including whether the independent registered public accounting firm's quality controls are adequate and the provision of permitted non-audit services is

compatible with maintaining the independent registered public accounting firm's independence, taking into account the opinions of management and internal auditors, if any.

(r)     Actively engage in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accounting firm.

(s)     Take appropriate action to oversee the independence of the independent registered public accounting firm.

(t)     Meet separately and periodically with the independent registered public accounting firm and discuss (i) the issues on which the Company's senior financial personnel consulted them, (ii) any matters of audit quality and consistency, and (iii) any audit problems or difficulties, including any restrictions on the scope of the independent registered public accounting firm's activities or on access to requested information and management's response to such problems or difficulties, including any significant disagreements between the independent registered public accounting firm and the Company's management.

(u)     Oversee compliance with the requirements of the SEC with respect to disclosure of the (a) services and fees of the independent registered public accounting firm (and, where applicable, any affiliate thereof) and (b) any conflict or potential conflict of interest of the independent registered public accounting firm.

(v)     Recommend to the Board, on an annual basis, that the engagement of the independent registered public accounting firm be submitted to the Company's stockholders for ratification at the annual meeting of stockholders.

94.     Under the same heading, in a subsection titled "Oversight of the Company's Internal Control over Financial Reporting" the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

(w)     Review and approve the audit plan and scope of work to be performed by any internal audit function of the Company.

(x)     Review and assess the adequacy and effectiveness of the Company's internal control over financial reporting with management, any internal audit function of the Company and the independent registered public accounting firm.

(y)     Review management's annual report on internal control over financial reporting prior to the Company's inclusion of such annual report in the Company's Annual Report on Form 10-K.

(z)    Review the independent registered public accounting firm's attestation report regarding the Company's internal control over financial reporting, if any, prior to the inclusion of such attestation report in the Company's Annual Report on Form 10-K.

(aa)    Review the effectiveness of any reports to management prepared by the internal independent accountant and management's response thereto, if any.

(bb)    On a quarterly basis, meet with the officers certifying the Company's periodic reports pursuant to the requirements of the Sarbanes-Oxley Act of 2002, and any other officers the Committee deems necessary or appropriate, to:

   (i)    discuss whether there are any significant deficiencies or material weaknesses that were noted in the most recently completed fiscal quarter in the design or operation of the Company's internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and, if applicable, the remediation plan (and status thereof) for such significant deficiencies or material weaknesses;

   (ii)    discuss whether there has been any fraud during the most recently completed fiscal quarter involving management or other employees who have a significant role in the Company's internal control over financial reporting;

   (iii)    discuss whether any changes in the Company's internal control over financial reporting occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, and whether any corrective actions were taken with regard to significant deficiencies or material weaknesses in the Company's internal control over financial reporting; and

   (iv)    obtain assurance that the disclosure controls and procedures have been adhered to for the relevant fiscal period.

(cc)    Understand the scope of the Company's internal auditors', if any, and independent registered public accounting firm's review of internal control over financial reporting, and obtain reports on significant findings and recommendations, together with management's responses and corrective action plans.

95.    Under the same heading, in a subsection titled "Compliance Oversight Responsibilities" the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

(dd)    Obtain from the independent registered public accounting firm assurance that Section 10A(b) of the Exchange Act, which addresses the discovery and disclosure of any illegal act, has not been implicated.

(ee)    Review all related-person transactions (as defined in Item 404 of Regulation S-K) and the disclosures related thereto, and oversee investigations regarding illegal or unethical behavior of the Company's officers, directors and employees in accordance with the Company's Code of Business Conduct and Ethics (the "Code of Conduct").

(ff)    Oversee and monitor compliance with the Code of Conduct and make recommendations to the Board regarding any non-compliance with, waivers to, or alteration of, the Code of Conduct, including consideration of possible conflicts of interest of Board members and executive officers.

(gg)    Establish, review, and, as necessary, update procedures for the receipt, retention and treatment of complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters (i.e., the Company's whistleblower program). The Committee shall periodically review (i) the Company's system for receiving and responding to "whistleblower" complaints related to questionable accounting, auditing and legal and regulatory compliance matters, (ii) the effectiveness of the system for monitoring accounting- or auditing-related compliance with all applicable laws and regulations and (iii) the results of management's investigation and follow-up as to any instances of noncompliance.

(hh)    Discuss with management and the independent registered public accounting firm any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

96.    Under the same heading, in a subsection titled "Risk Oversight" the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

(kk)    Oversee the Company's program for identifying, evaluating and controlling significant risks. In connection with this responsibility, and in addition to the relevant duties and responsibilities discussed above, the Committee shall discuss with management and the Company's independent registered public accounting firm the Company's major risk exposures and the steps taken to monitor, control and minimize such exposures. The Committee shall also review and evaluate the Company's processes and policies for identifying and assessing key risk areas and for formulating and implementing steps to address such risk areas.

(ll)    Review, discuss with management, and oversee the Company's privacy, information technology and security and cybersecurity risk exposures, including: (i) the potential impact of those exposures on the Company's business, financial results, operations and reputation; (ii) the programs and steps implemented by management to monitor and mitigate any exposures; (iii) the Company's information governance and information security policies and programs; and (iv) major legislative and regulatory developments that could materially impact the Company's privacy, data security and cybersecurity risk exposure.

97.    In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

98.    Marinus is a pharmaceutical company that focuses on developing treatments for seizure disorders at the commercial stage. The Company's leading product is ZTALMY (generic name ganaxolone).

99.    ZTALMY was approved by the FDA as an oral suspension CV for the treatment of seizures associated with Cyclin-dependent Kinase-like 5 Deficiency Disorder on March 18, 2022.

100.    In describing ganaxolone, the Company called it "a synthetic analog of allopregnanolone, an endogenous neurosteroid, and targets both synaptic and extrasynaptic GABAA." The Company goes on to explain that "[t]his unique receptor binding profile may contribute to the anticonvulsant, antidepressant and anxiolytic effects shown by neuroactive steroids in animal models, clinical trials or both."

### *The Company Initiates the RAISE Phase 3 Trial as it Researches IV Ganaxolone*

101.    In addition to ZTALMY, Marinus also began researching whether ganaxolone can be administered through IV to treat "other rare genetic epilepsies, including Tuberous Sclerosis Complex (TSC) and for the treatment of Refractory Status Epilepticus (RSE)."

102.    In 2019, the Marinus announced that its research into IV ganaxolone yielded "positive top-line results in our open-label, dose-finding Phase 2 clinical trial evaluating IV ganaxolone in patients with RSE. The trial enrolled 17 medically heterogeneous patients who received an infusion of IV ganaxolone for up to 96 hours added to the standard-of-care" for the treatment of Refractory Status Epilepticus ("RSE").

103.    As a result of these results, in January 2021, the Company moved on to the next step in getting IV ganaxolone approved by the FDA, a Phase 3 trial dubbed "RAISE," by enrolling its first patient.

104.    The RAISE trial was structured as "a randomized, double-blind, placebo-controlled clinical trial in patients with RSE. We expect approximately 80 trial sites in hospitals, primarily across the U.S. and Canada, to participate."  Further, the Company planned the RAISE trial "to enroll approximately 124 patients, who will be randomized to receive ganaxolone or placebo added to standard of care. With this number of patients, the trial is designed to provide over 90% power to detect a 30% efficacy difference between ganaxolone and placebo."

105.    The goals of the RAISE trial, also known as the primary endpoints, were "for the RAISE trial are (1) proportion of patients with RSE who experience seizure cessation within 30 minutes of treatment initiation without other medications for SE treatment, and (2) proportion of patients with no progression to IV anesthesia for 36 hours following initiation of the study drug."

106.    Problems with the RAISE trial arose almost immediately, slowing the enrollment process of the entire trial. The first of these issues was "COVID-related difficulties" which

impacted the medical facilities participating in. This was generally related by staff turnover and a reallocation of resources to COVID patients that would cause delays.

107.    In February 2022, manufacturing issues arose that forced the Company to temporarily suspend the RAISE trial "after routine monitoring of stability batches of clinical supply material indicated that it became necessary to reduce the shelf life to less than the anticipated 24 months to meet product stability testing specifications."

108.    The RAISE trial finally resumed in May 2022 through, after consulting with the FDA, "utilizing new batches of the original buffer IV formulation of ganaxolone, and we implemented a reduced shelf life of 12 months."

109.    In June 2022, the Company announced an amendment to the RAISE trial protocols in order to "expand eligibility criteria to support recruitment." In essence, to speed up the trial, the Company received FDA approval to "broaden[] the inclusion criteria to permit patients previously treated with up to 18 hours of high-dose IV anesthesia to qualify for the trial, rather than excluding patients treated with anesthetics at high doses for any duration." In doing so, the Company felt "this will facilitate the enrollment of patients transferred to the ICU from other hospitals or the emergency room, who may already have received high doses of anesthetic medication for less than 18 hours." As a result of this amended protocol, the Company ""reached alignment with the FDA on the protocol amendment, including a proposal for a ***potential interim analysis*** when two-thirds of the patients (approximately 82) have completed the trial."

110.    As of June 30, 2023, the Company was reporting that there was an expectation of the RAISE trial "reaching the enrollment target for the interim analysis and announcing topline data in the first quarter of 2024."

111.    As of November 7, 2023, the Company was reporting that it had over three-quarters of the patients needed for an interim analysis enrolled in the RAISE trials, with an expectation that "[e]nrollment for the interim analysis [] to conclude in the first quarter of 2024 with topline data now anticipated in the second quarter of 2024, assuming pre-defined stopping criteria for an interim analysis are met."

112.    In explaining what was expected of the interim analysis for the first time, Defendant Hulihan explained that "[t]he protocol provides for an analysis of 82 patients, which is powered at 94% to detect a 40% difference between ganaxolone and placebo."

113.    As recently as March 5, 2024, when the Company filed its Form 10-K for the 2023 Fiscal Year with the SEC (the "2023 10-K) on March 5, 2024, the stopping criteria for the interim analysis was described as:

> We reached alignment with the FDA on a protocol amendment, including a proposal for an interim analysis when two-thirds of the patients (approximately 82) have completed assessment of the primary and key secondary trial endpoints. At the time of the interim analysis, the trial will have over 90% power to detect a 40% difference in treatment outcomes between ganaxolone and placebo. We reached the enrollment target for the interim analysis in the first quarter of 2024. If the pre-defined stopping criteria from the planned interim analysis are met, we expect our interim analysis with top-line data readout for the RAISE trial to be available in the second quarter of 2024. We believe positive interim RAISE trial results would be adequate for regulatory filing purposes in RSE in the U.S.

114.    In essence, the RAISE trial was trying to show that treatment through IV ganaxolone had a statistically different effect, i.e. a better outcome, than a placebo. An interim analysis, which reduces the number of patients that the analysis is based on, can end the trial early if it meets a higher statistical threshold than the original endpoint. To show statistical significance with less patients is materially more difficult.

***The Push For an Interim Analysis Arose Due to the Company's Financial Situation***

115.    Despite having released ZTALMY on the commercial market in 2022, it did little to assist the Company's financial position and funding. Through the first three quarters of 2023, Marinus only saw a return on $13 million from ZTALMY sales.

116.    Despite this, throughout 2023, it was reiterated that the Company's cash positions were sufficient to fund its operations and capital expenditures through the second half of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year").

117.    Occurring at the same time as the RAISE trial, the Company was also conducting research into whether oral ganaxolone would be effective at treating TSC. As explained by the Company: "TSC is a rare genetic disorder that affects many organs by causing, typically non-malignant, tumors in the brain, skin, kidney, heart, eyes, and lungs. The condition is caused by inherited mutations in either the TSC1 or TSC2 gene. It occurs with a frequency of approximately 1:6,000 live births, with a mutation being found in 85% of patients." According to Defendants, TSC is a leading cause of genetic epilepsy, often manifesting in the first year of life as either focal seizures or infantile spasms."

118.    By the second quarter of the 2022 Fiscal Year, Marinus had dosed the first patient in the Phase 3 trial for using oral ganaxolone to treat TSC (dubbed "TrustTSC"). As both the TrustTSC trial and RAISE trial were operating simultaneously, they were also competing for Company resources at the same time.

119.    Despite this, the Company asserted that there were significant cash resources to bring both RAISE and TrustTSC to fruition.

120.    Among these supposed resources, in September 2020 the Company entered into a funding agreement with the Biomedical Advanced Research and Development Authority ("BARDA"), which was a division of the United States Department of Health and Human

Services' Office of the Assistant Secretary for Preparedness and Response. As described by the

Company:

> In September 2020, we entered into a contract (BARDA Contract) with the Biomedical Advanced Research and Development Authority (BARDA), a division of the U.S. Department of Health and Human Services' Office of the Assistant Secretary for Preparedness and Response. Under the BARDA Contract, we received an award of up to an estimated $51 million for development of IV-administered ganaxolone for the treatment of RSE. The BARDA Contract provides for funding to support, on a cost-sharing basis, the completion of a Phase 3 clinical trial of IV-administered ganaxolone in patients with RSE, which covers the RAISE trial, funding of pre-clinical studies to evaluate IV-administered ganaxolone as an effective treatment for RSE due to chemical nerve gas agent exposure, and funding of certain ganaxolone manufacturing scale-up and regulatory activities. In March 2022, we entered into an amendment with BARDA to extend the end date of our base performance period for funding under the BARDA Contract from September 1, 2022 to December 31, 2023. In September 2022, we entered into an amendment with BARDA that, among other things, (i) provides for the exercise of BARDA's option under the BARDA Contract to support U.S. onshoring of the manufacturing capabilities for ganaxolone API (Option 2), (ii) changes the end date of our performance period under Option 2 from December 31, 2026 to July 31, 2025, (iii) increases the government cost share amount under Option 2 from approximately $11.5 million to approximately $12.3 million, and (iv) increases our cost share amount under Option 2 from approximately $4.9 million to approximately $5.3 million.

> The BARDA Contract consists of an approximately two-year base period, which was extended through December 31, 2023, during which BARDA will provide up to approximately $21 million of funding for the RAISE trial on a cost share basis and funding of additional preclinical studies of ganaxolone in nerve agent exposure models. Following successful completion of the RAISE trial and preclinical studies in the contract period the BARDA Contract provides for approximately $31 million of additional BARDA funding for three options in support of ganaxolone manufacturing, supply chain, clinical, regulatory and toxicology activities, including the $12.3 million exercise of Option 2 as described above. Under the BARDA Contract, we will be responsible for cost sharing in the amount of approximately $33 million and BARDA will be responsible for approximately $52 million if all development options are completed. The contract period-of-performance (base period plus option exercises) is up to approximately five years.

> We recognize federal contract revenue from the BARDA Contract in the period in which the allowable research and development expenses are incurred. We expect federal contract revenue to increase as the costs associated with our RAISE trial increase.

121.    In September 2023, the BARDA agreement was amended to extend to the period from December 31, 2023 through September 30, 2024.

122.    Therefore, at all relevant times, it was claimed that there would be enough funding between the BARDA funding and the Company's positions to reach the end of a full enrollment period for the RAISE trial and that the Company can fund RAISE and TrustTSC simultaneously.

123.    However, this omitted the fact that Marinus's cash position was not adequate to complete the RAISE trial to fruition should it fail to meet the stopping criteria at the interim review, an event that the Company's own senior biometricians informed the executives. As such, since the beginning of at least the Relevant Period, the Individual Defendants were aware of, but failed to disclose, that if the RAISE trial failed to meet its stopping criteria at its interim analysis, the Company would end the study by ending the enrollment of new patients well short of the 124 in which the Company based its trial.

***The Individual Defendants Were Aware the Interim Results Were Unlikely to Meet the RAISE Trial's Stopping Criteria***

124.    Senior biometricians at Marinus warned the Company internally that interim analysis would be a mistake and instead to wait for final analysis of the RAISE trial. However, because the Individual Defendants were aware in 2023 that the Company would not continue the RAISE trial beyond the interim analysis stage, regardless of the outcome as it did not have adequate funds to do so, these biometricians were ignored.

125.    As was explained by FE1, months before the interim analysis, FE1 and their team repeatedly informed Defendant Hulihan that the Company should not conduct the interim analysis for RAISE in the spring of 2024. This recommendation was based on FE1's team calculating the power percentage the trial would reach by the interim analysis, showing a much higher bar to pass to show statistical significance than if the Company were to wait for a fully-enrolled final analysis.

These calculations were reported directly by FE1 to Defendant Hulihan, who in turn informed Defendant Braunstein.

126.    However, months before the interim analysis, Defendant Hulihan informed FE1 that the Company would stop the RAISE trial early no matter the result of the interim analysis. Specifically, Defendant Hulihan told FE1 that the Company did not have the funding to finish the RAISE trial, stating "we're going to stop the trial because of finances." According to FE1, this decision had already been approved by Defendant Braunstein and was no secret amongst Company leadership. FE1 also stated that the decision was made prior to FE1's conversations with Defendant Hulihan, meaning in 2023.

127.    Much of this information was further corroborated by FE2, who had heard multiple employees discussing that the Company had pre-emptively decided to halt the RAISE trial at the interim analysis no matter the outcome due to financial reasons.

128.    Per FE3, the Company's head of Data Management, George Laskaris ("Laskaris"), repeatedly told Defendant Hulihan that there was serious data management and integrity issues with the RAISE trial. This "messy" data meant a significantly increased risk of variability, making differences between the IV ganaxolone and placebo more difficult to detect. Even in moving towards the interim analysis, the Company failed to expend the resources necessary to clean this data.

129.    By January 2024, FE3 had heard Laskaris tell Defendant Hulihan, as well as other executives, of these issues with the trial data during a phone call. Laskaris also told FE3 that management had not been listening or doing anything about these data management issues, and his reports were repeatedly dismissed by Defendant Hulihan and others. As stated by FE3, by

consistently raising these concerns, Laskaris was advising the Company not to go forward with the interim analysis.

130.    FE3 also discussed the process of locking the RAISE trial data. All data must be "locked" prior to submission to ensure nothing can change beyond a certain date. As such, Company employees (or employees of the Company's contract research organization) were required to go to all sites and review the patient charts to ensure the accuracy of the information that would make up the trial's dataset.

131.    However, FE3 revealed that the process of locking the trial data from RAISE was rushed as compared to other trials, with the locking deadlines set suddenly and a short turnaround time. Marinus even pulled employees off of other clinical trials to assist with the locking tasks.

### *Marinus Announces the Interim Analysis Results and Ends the RAISE Trial Anyway*

132.    On April 15, 2024, the Company announced the results of the RAISE trial interim analysis. The interim analysis showed that IV ganaxolone failed to achieve the primary endpoints set for the trial and therefore, the trial did not reach its stopping criteria.

133.    Less than one month later, on May 8, 2024, the Company announced it was no longer enrolling new patients in the RAISE trial, with only 96 of the anticipated 124 participants actually enrolled.

134.    On June 17, 2024, the Company revealed its topline results for the RAISE trial. During this announcement, it was confirmed that the RAISE trial failed to "achieve statistical significance on one of its co-primary endpoints."

### **False and Misleading Statements**

### *November 7, 2023 Press Release*

135.    On November 7, 2023, the Company issued the Q3 2023 Earnings Release, announcing its financial results for the third quarter of the 2023 Fiscal Year as well as providing investors with business updates.

136.    The Q3 2023 Earnings Release discussed the RAISE trial, reporting that there were now "[o]ver 75% of patients required for the interim analysis are now enrolled in the Phase 3 RAISE trial in refractory status epilepticus; if the trial meets pre-defined stopping criteria at the interim analysis, topline data now anticipated Q2 2024."

137.    The Q3 2023 Earnings Release also quoted Defendant Braunstein, who said of the RAISE trial, that the Company "remain acutely focused on advancing our Phase 3 clinical trials in refractory status epilepticus and tuberous sclerosis complex." Defendant Braunstein continued that "[w]hile we're disappointed that we now project RAISE enrollment to conclude by the end of the first quarter, we remain confident in the benefit that IV ganaxolone could bring to critically ill RSE patients and the significant commercial opportunity." Lastly, Defendant Braunstein stated that the Company was "*committed to successfully completing both the RAISE and TrustTSC trials in 2024 and continue to make the investments to prepare for these commercial launches*."

138.    In discussing the Company's cash position, the Q3 2023 Earnings Release reported an expectation "that cash, cash equivalents, and short-term investments of $176.4 million as of September 30, 2023, will be sufficient to fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024."

*November 7, 2023 Form 10-Q*

139.    That same day, the Company issued its quarterly report on Form 10-Q with the SEC for the third quarter of the 2023 Fiscal Year (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed

by Defendants Braunstein and Pfanstiel and attached certifications pursuant to Rules 13a-14(a)

and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Braunstein and Pfanstiel attesting to the accuracy of the 3Q 2023 10-Q and that "the

information contained in the [3Q 2023 10-Q] fairly present in all material respects the financial

condition, results of operations and cash flows of the [Company]."

140.    The Q3 2023 10-Q reported that the Company "now expect[s] our interim analysis

with top-line data readout for the RAISE trial to be available in the second quarter of 2024, if the

pre-defined stopping criteria from the planned interim analysis are met." Further, in discussing the

RAISE trial the Q3 2023 10-Q stated:

> In January 2021, we enrolled the first patient in the Phase 3 pivotal RAISE trial.
> The RAISE trial is a randomized, double-blind, placebo-controlled clinical trial in
> patients with RSE. We expect approximately 70 trial sites in hospitals, primarily
> across the U.S. and Canada, to participate. The RAISE trial is designed to enroll
> approximately 124 patients, to be randomized to receive ganaxolone or placebo
> added to standard of care. With this number of patients, the trial is designed to
> provide over 90% power to detect a 30% efficacy difference between ganaxolone
> and placebo. We reached alignment with the FDA on a protocol amendment,
> including a proposal for an interim analysis when two-thirds of the patients
> (approximately 82) have completed the trial. ***We anticipate reaching the
> enrollment target for the interim analysis in the first quarter of 2024 with topline
> data now expected in the second quarter of 2024, if the pre-defined stopping
> criteria from the planned interim analysis are met. We believe positive interim
> RAISE trial results could be adequate for regulatory filing purposes in RSE***.
>
> The co-primary endpoints for the RAISE trial are (1) proportion of patients with
> RSE who experience seizure cessation within 30 minutes of treatment initiation
> without other medications for SE treatment, and (2) proportion of patients with no
> progression to IV anesthesia for 36 hours following initiation of the trial drug. In
> June 2022, we announced that we amended the protocol for the RAISE trial to
> expand eligibility criteria to support recruitment. We broadened the inclusion
> criteria to permit patients previously treated with up to 18 hours of high-dose IV
> anesthesia to qualify for the trial, rather than excluding patients treated with
> anesthetics at high doses for any duration. We believe this will facilitate the
> enrollment of patients transferred to the ICU from other hospitals or the emergency
> room, who may already have received high doses of anesthetic medication for less
> than 18 hours.

141.    In discussing the Company's liquidity, the Q3 2023 10-Q stated:

Since inception, other than for the three months ended September 30, 2022 due to a one-time net gain from the sale of our Priority Review Voucher (PRV), we have incurred net losses and negative cash flows from our operations. We incurred a net loss of $99.6 million for the nine months ended September 30, 2023. There is no assurance that profitable operations will be achieved in the future, and if achieved, could be sustained on a continuing basis. In addition, development activities, clinical and preclinical testing, and commercialization of ganaxolone (in indications other than CDD in the U.S.) will require significant additional financing. Our accumulated deficit as of September 30, 2023 was $530.2 million, and we expect to incur substantial losses in future periods. We plan to finance our future operations with a combination of proceeds from the issuance of equity securities, the issuance of debt, government funding, collaborations, licensing transactions and other commercial transactions or other sources, and revenues from product sales. We have not generated positive cash flows from operations, and there are no assurances that we will be successful in obtaining an adequate level of financing for the continued development and commercialization of ganaxolone.

Management's operating plan, which underlies the analysis of our ability to continue as a going concern, involves the estimation of the amount and timing of future cash inflows and outflows. Actual results could vary from the operating plan. We follow the provisions of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 205-40, Presentation of Financial Statements—Going Concern, which requires management to assess our ability to continue as a going concern within one year after the date the financial statements are issued. ***We believe that our existing cash, cash equivalents and short-term investments as of September 30, 2023, will be sufficient to fund our operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under our debt facility, for the one-year period after the date the financial statements are issued***. However, we will need to secure additional funding in the future, from one or more equity or debt financings, government funding, collaborations, licensing transactions, other commercial transactions or other sources in order to carry out all of our commercialization and planned research and development activities with respect to ganaxolone.

### *November 7, 2023 Earnings Call*

142.    Additionally on November 7, 2023, the Company hosted its quarterly earnings call with investors to discuss the Company's financial and operational results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Call").

143.    On the Q3 2023 Earnings Call, Defendant Braunstein stated of the RAISE trials and the Company's ability to fund the trial:

Let me take a few moments to review our clinical pipeline, starting with an update on the Phase III RAISE trial of IV ganaxolone in refractory status epilepticus. And our last update provided at our investor and analyst event in September, we noted the RAISE trial enrollment was on an upward trajectory since early August, following the activations of all clinical sites. Although total enrollment has continued to grow and screening activity remains quite high, the rate of enrollment has continued to show more variability than we expected. Based on current enrollment trends, we now project to enroll the number of patients required for the interim analysis by the end of the first quarter of 2024 rather than our previous guidance of January. As a result, we now anticipate top line data in the second quarter of 2024 if the predefined stopping criteria for the interim analysis are met.

The entire organization remains acutely focused on advancing our Phase III clinical trials in refractory status epilepticus and TSC. We are confident in the benefit that IV ganaxolone could bring to critically ill patients and the significant commercial opportunity for the first novel therapy for acute status in well over a decade. We are committed to successfully completing both the RAISE and TrustTSC trials in 2024 and continue to make the investments to prepare for these commercial launches. Preparations are underway for an NDA filing, and we don't expect the additional delays to significantly impact the timing of our commercial launch.

***Finally, with the success of ZTALMY, the recent extension of our cash runway into Q4 2024 and tightening of our spend to focus on our most valuable market opportunities, we believe we have the appropriate resources required to complete 2 key data readouts and prepare for a bright future.***

\* \* \*

Moving to our oral franchise. We are actively enrolling patients in our global Phase III TrustTSC trial. We believe that ZTALMY can address a significant unmet medical need for patients suffering from refractory seizures associated with TSC, and we are currently the only product in Phase III development for this indication. Blinded discontinue rates in this trial remain low, which gives us high confidence in the tolerability and potential efficacy of our new titration schedule. We expect top line data mid-2024 and have every reason to believe that this study can replicate the success of ZTALMY even in the Marigold trial and our real-world experience to date. ***With several key readouts in 2024, we believe we have laid a strong foundation for near and long-term growth and have prioritized fee programs and our cash runway accordingly***.

144.    For his scripted remarks on the Q3 2023 Earnings Call, Defendant Hulihan also

discussed the RAISE trial, stating:

As Scott mentioned, the RAISE trial of IV ganaxolone in refractory status continues to enroll with over 75% of the patients required for the interim analysis randomized

to date. U.S. centers account for the bulk of enrollment with newer sites continuing to add patients. With that said, based on the current enrollment rate, we believe the number of patients required for the interim analysis will be enrolled by the end of the first quarter, with top line data now expected in the second quarter 2024. As Scott mentioned, although patient screening continues at a high rate, we're seeing more enrollment variability than anticipated. Our paramount consideration is limiting enrollment for the right patients to demonstrate the clinical benefit of ganaxolone in a highly refractory RSE population, and I'm confident that the criteria for study qualification will do that. We continue to maintain a strong emphasis on site engagement and education, including in-person site outreach from our medical scientific affairs team, peer-to-peer programs between site coordinators and principal investigators, virtual investigator meetings and case reviews.

Now, let me provide a brief overview of what to expect from the interim analysis. The protocol provides for an analysis of 82 patients, which is powered at 94% to detect a 40% difference between ganaxolone and placebo. As we've discussed previously, the coprimary endpoints assess, one, onset of action, as measured by the proportion of participants with SE cessation within 30 minutes without medications for the acute treatment status; and two, durability of effect, as reflected in the proportion of participants who do not progress to IV anesthesia within 36 hours.

The key secondary endpoints are, first, time to status cessation following study drug initiation, which is another way to assess onset of effect. And second, lack of progression to IV anesthesia for 72 hours following study drug initiation. The latter endpoint's important because it assesses durability of effect after the infusion of study medication is completed.

The top line data of the interim analysis will include results of the coprimary and key secondary endpoints, and we plan to announce these results if the study meets stopping criteria for efficacy. Other secondary and healthcare utilization endpoints will be analyzed after all patients have completed the full study and will be presented at upcoming scientific meetings.

***Following a successful interim analysis***, we plan to begin transitioning the majority of RAISE sites to open-label enrollment and then shortly transition a subset of these sites to the RAISE II study. This will help support a smooth and rapid completion for RAISE II, with the goal of driving improved time lines. We anticipate enrolling the first patients in RAISE II prior to the end of the year.

145.    The Q3 2023 Earnings Call also featured a question-and-answer portion, with many

investors having questions about the RAISE trial and upcoming interim analysis. In response to

one analyst's question, Defendants Hulihan and Braunstein responded:

*Joon Lee*: I just want to confirm that at 82 patients, the study is 94% powered to detect a 40% effect size on the coprimary endpoints, but you haven't disclosed the stopping criteria. ***And has the stopping criteria changed over time as you look at the enrollment, which has been a little slower than expected, given that if you don't stop at interim, that you can actually spill into maybe a much later time point for the full study to read out***.

*Defendant Hulihan*: Yes, Joon. Thanks for the question. Yes, that's absolutely right. ***It's 94% powered to detect a 40% treatment difference. Actually, we could see statistical significance at a delta lower than that***. Down in the range of 25%, we would still see statistical significance. And the stopping criteria are statistical significance. When you do an interim analysis, there's always a spend in the alpha that you have to do. And that works out actually to have -- if we went to the end, it actually would have a minimal impact on the statistical power at the end of the study. ***But even with a -- it's 0.0293, but that is -- and with that, we have 94% power to detect that 40% delta. So again, well-powered at the interim. Very confident about it***.

*Defendant Braunstein*: ***And Joe, the only I'll add, Joon, to be clear, we have not moved the goalpost at all on that. I think we had very conservative assumptions going into the trial***, as I mentioned earlier, not having a good handle on exactly what the placebo rate would be. We conservatively thought about a placebo rate 30% or higher. And that's clearly, at least what we believe to be the case today, a much -- ***we're seeing a much lower placebo rate, which just, in our minds, gives us a lot more flexibility in terms of hitting statistical significance***. But we have not moved the goalpost at all in that regard.

### January 4, 2024 Press Release

146.    On January 4, 2024, the Company issued a press release announcing its preliminary financial results and business updates for the fourth quarter and year-end of the 2023 Fiscal Year (the "Preliminary FY 2023 Earnings Release"). The Preliminary FY 2023 Earnings Release announced that the Company had enrolled over 90% of the patients required for an interim analysis in the RAISE trial.

147.    The Preliminary FY 2023 Earnings Release also quoted Defendant Braunstein as stating that "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated, beginning with topline data from the RAISE trial of IV ganaxolone in refractory status epilepticus in the second quarter followed by the TrustTSC study readout in

tuberous sclerosis complex in the third quarter." Defendant Braunstein further stated that, "[w]e have an opportunity to address significant unmet needs in patients with refractory seizure disorders and remain committed to developing potentially lifesaving treatments."

148.    Regarding the Company's cash, the Preliminary FY 2023 Press Release stated that the Company had "[p]reliminary unaudited cash, cash equivalents, and short-term investments of $150.3 million as of December 31, 2023." The Preliminary FY 2023 Press Release also contained the expectation that the Company's cash position could "fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024."

### *March 5, 2024 Press Release*

149.    On March 5, 2024, the Company issued a press release announcing its financial results and business updates for the fourth quarter and year end of the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release revealed that "Phase 3 RAISE trial interim analysis enrollment target achieved with Data Monitoring Committee (DMC) review scheduled and topline results expected in first half of Q2 2024."

150.    The FY 2023 Earnings Release also quoted Defendant Braunstein in discussing reaching the enrollment target for the interim analysis, stating, "[w]e are thrilled to announce we have exceeded the enrollment threshold required to conduct an interim analysis in the Phase 3 RAISE trial in refractory status epilepticus, a life-threatening condition." Defendant Braunstein went on to say that "[w]ith over 90 patients now randomized following several months of increasingly strong enrollment trends, we are on track to announce topline data in the second quarter, assuming efficacy criteria for the interim analysis are met."

151.    On the interim analysis, the FY 2023 Earnings Release stated that the RAISE trial had "[a]chieved enrollment target required for an interim analysis in the Phase 3 RAISE trial of intravenous (IV) ganaxolone in refractory status epilepticus (RSE)," and that "[i]f pre-defined stopping criteria for the interim analysis are met, the Company expects to report topline data in the first half of the second quarter of 2024." Further, on the enrollment the FY 2023 Earnings Release stated that "[s]trong enrollment trends have continued and now expect approximately 100 patients to be randomized by the conclusion of the interim analysis; this larger database will support health economic outcomes." The FY 2023 Earnings Release ended by stating the Company was "[t]argeting submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) in early 2025 with priority review expected."

152.    In discussing the Company's cash positions, the FY 20223 Earnings Release by stating that there was an expectation "that cash, cash equivalents and short-term investments of $150.3 million as of December 31, 2023, will be sufficient to fund the Company's operating expenses, capital expenditure requirements and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024."

***March 5, 2024 Earnings Call***

153.    That same day, the Company hosted an earnings call with investors to discuss the financial results and business updates from the fourth quarter and year-end of the 2023 Fiscal Year (the "FY 2023 Earnings Call").

154.    During his prepared remarks on the FY 2023 Earnings Call, Defendant Braunstein stated about the RAISE trial that "[a]s we announced in our press release this afternoon, we are pleased to report that we have met the enrollment criteria for the interim analysis and now have more than 90 patients enrolled in the trial." Defendant Braunstein went on to state that "[w]e expect

to deliver the interim results to the data monitoring committee over the coming weeks and plan to announce the outcome within the first half of the second quarter," before concluding that "[b]ased on continued strong enrollment seen over the past six months, we project approximately 100 patients to be included in the secondary endpoint analyses."

155.    During his scripted remarks on the FY 2023 Earnings Call, Defendant Hulihan stated of the RAISE trial:

> Starting with the RAISE trial of IV ganaxolone in refractory status. After a strong end of 2023, I'm excited to report that in January, we hit our enrollment requirement for the interim analysis. With this critical milestone achieved and dates scheduled for DMC review of the data, *we continue to expect to report top line results in the second quarter of 2024*.
>
> Now that we've achieved the required enrollment target for the interim analysis, the clinical operations scheme has been hard at work, ensuring the integrity and completeness of the study data to be provided to the DMC for their review. Here's what you can expect next in the process. Presently, the clinical operations team is focused on data cleaning in anticipation of generating interim analysis dataset.
>
> Once the preparatory steps are complete, the data will be provided to the DMC for a determination of whether the studies met the pre-specified efficacy stopping boundaries on the co-primary endpoints. If the study achieves these pre-specified stopping rules, the Marinus leadership team will then evaluate the data and share top line results publicly soon thereafter, including both the co-primary and key secondary endpoints. Successful results would serve as the basis for submission of a U.S. regulatory filing.

156.    In his prepared remarks on the FY 2023 Earnings Call, Defendant Pfanstiel stated of the Company's cash positions:

> We were also not afraid to make tough decisions, such as discontinuing the established status epilepticus trial and making other cost reductions to ensure adequate cash runway headed into two significant data readouts. As a result, we ended 2023 with cash, cash equivalents and short-term investments of 150.3 million. This is expected to provide cash runway late into the fourth quarter of 2024. And importantly, we project a cash balance of greater than 100 million at the expected RSE readout.
>
> We announced earlier in the quarter that we project 2024 U.S. ZTALMY net product revenues of between 32 million and 34 million. As Christy mentioned, this increase from 2023 represents continued strong and steady execution on the launch.

Unlike 2023, we are not providing full year 2024 operating expense guidance at this time as the level of investment will depend on the outcome of the RSE and TSC Phase 3 trials. However, we expect operating expenses and cash burn in the near term to be consistent with the 2023 trends.

157.    During the question-and-answer portion of the call, in response to an investor question about the stopping rules for the RAISE trial, Defendant Hulihan responded:

*Charles Duncan*: Yeah, hey. Good afternoon Scott and team congrats on completing that enrollment and commercial progress in the year. I had a question regarding RAISE I. I can't recall if you've ever shared with us stopping rules. And if you don't want to be all that granular, if you could just give us some guideposts. And then also, I didn't hear anything about second-generation oral ganaxolone. Do you have any color on the progress there? Thanks.

\* \* \*

*Defendant Hulihan*: Yes, sure Charles. I mean, we're glad to share what the details of that are -- so the stopping criteria are based on the co-primary endpoints, cessation within 30 minutes and lack of progression to IV anesthesia within 36 hours, each of their coprimary endpoints, so both of those need to hit on the statistical significance independently. And the way the powering based on an alpha spending function, the p-value -- required p-value at the interim is 0.0293. And that -- with that p-value, we have over 90% power to detect a 40% treatment difference. With that said, if we get deltas 25%, 30% it will still be statistically significant. The analysis is very robust. And so we have a lot of power at the interim analysis based on the 83 patients. And then we'll also be looking at the key secondary endpoints at the interim, but the stopping rules depend on the co-primaries.

158.    The statements in ¶¶ 135-157 were materially false and misleading at the time they were made because the Individual Defendants misrepresented to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the data for the RAISE trial was messy; (2) as a result, the Company needed to expend significant resources in order to clean it to uniformity; (3) the Company had been informed by November 7, 2023 to avoid an interim analysis due to the probability of meeting the enhanced

criteria to stop the trial early; (4) to avoid this, the Company omitted any contradictory advice of senior staff as the Company did not have adequate resources to complete both the RAISE trial and the TrustTSC trial; (5) by not having adequate resources, the Company committed to end the trial at the interim analysis anyway despite knowing it would fail to meet its primary endpoints; (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 EIP; and (7) the Company did not have adequate internal controls over financial reporting. As a result, Marinus's statements were materially false and misleading at all relevant times.

### *2024 Proxy Statement*

159.    On April 4, 2024, the Company filed with the SEC its 2024 Proxy Statement. Defendants Braunstein, Austin, Ezickson, Fischer Johnson, Mayleben, Nochur, Noonberg, and Silverstein solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

160.    The 2024 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Austin, Ezickson, and Johnson to the Board; (2) ratify the selection of Ernst & Young as the Company's Independent Registered Public Accounting Firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, executive compensation; and (4) approve the 2024 EIP.

161.    The 2024 Proxy Statement explains that 2024 EIP would be comprised of 4,000,000 shares and any shares otherwise available under the pre-existing 2014 Equity Incentive Plan. Upon the approval of the 2024 EIP, the 2014 Equity Incentive Plan would become ineffective. Should the 2024 EIP not be approved, shares would continue to be granted under the 2014 Equity Incentive Plan until the expiration of the 2014 Equity Incentive Plan in July 2024, which would thus prohibit any 2025 equity grants from being granted.

162.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided, in

relevant part:

> Our Board has adopted a Code of Business Conduct and Ethics applicable to all of
> our employees, officers and directors. The Code of Business Conduct and Ethics
> outlines the principles, policies and laws that govern our activities and establishes
> guidelines for conduct in the workplace. Every employee, officer and director is
> expected to be familiar with the Code of Business Conduct and Ethics and adhere
> to the principles and procedures set forth in the Code of Business Conduct and
> Ethics that apply to them. Our Audit Committee is responsible for overseeing the
> Code of Business Conduct and Ethics and our Board must approve any waivers of
> the Code of Business Conduct and Ethics for employees, officers or directors. We
> expect that any amendments to the Code of Business Conduct and Ethics, or any
> waivers of its requirements, will be disclosed on our website. Copies of the Code
> of Business Conduct and Ethics can be obtained free of charge from our website,
> www.marinuspharma.com, or by contacting our Secretary at our offices at Marinus
> Pharmaceuticals, Inc., 5 Radnor Corporate Center, Suite 500, 100 Matsonford
> Road, Radnor, PA 19087.

163.    Regarding the "Board Role in Risk Oversight," the 2024 Proxy Statement provided,

in relevant part:

> The full Board as a whole oversees our risk management systems and processes.
> Each standing Committee has been delegated oversight of certain categories of risk
> and provides the Board with regular reports regarding the Committees activities.
> Assessing and managing risk is the responsibility of our management, which
> establishes and maintains risk management processes, including prioritization,
> action plans and mitigation measures. It is management's responsibility to
> anticipate, identify and communicate risks to the Board and/or its Committees and
> discuss strategic plans and objectives, business results, financial condition,
> compensation programs, strategic transactions, and other matters in the context of
> various categories of risk. Our senior executives provide these reports to the Board
> and/or its committees.

164.    Defendants Braunstein, Austin, Ezickson, Fischer Johnson, Mayleben, Nochur,

Noonberg, and Silverstein caused the 2024 Proxy Statement to be false and misleading by failing

to disclose, *inter alia*, that: (1) the data for the RAISE trial was messy; (2) as a result, the Company

needed to expend significant resources in order to clean it to uniformity; (3) the Company had

been informed by November 7, 2023 to avoid an interim analysis due to the probability of meeting

the enhanced criteria to stop the trial early; (4) to avoid this, the Company omitted any

contradictory advice of senior staff as the Company did not have adequate resources to complete both the RAISE trial and the TrustTSC trial; (5) by not having adequate resources, the Company committed to end the trial at the interim analysis anyway despite knowing it would fail to meet its primary endpoints; (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 EIP; and (7) the Company did not have adequate internal controls over financial reporting. As a result, Marinus's statements were materially false and misleading at all relevant times.

165.    The 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

166.    Defendants Braunstein, Austin, Ezickson, Fischer Johnson, Mayleben, Nochur, Noonberg, and Silverstein causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, (1) to reelect Defendants Austin, Ezickson, and Johnson to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approve the 2024 EIP.

167.    As a result of the shareholders approving the 2024 EIP, there was a new plan in place upon the expiration of the preexisting plan. As such, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 EIP in the future.

**The Truth Emerges**

*April 15, 2024 Press Release*

168.    The truth began to emerge on April 15, 2024, before the market opened, when the

Company issued the April 2024 Update Press Release. The April 2024 Update Press Release

revealed the results of the RAISE trial's interim analysis, namely that the analysis did not meet the

early stopping criteria. The April 2024 Update Press Release stated:

> [Marinus], a pharmaceutical company dedicated to the development of innovative
> therapeutics to treat seizure disorders, today announced that an independent Data
> Monitoring Committee (DMC) ***has recommended continuing the pivotal Phase 3
> RAISE trial evaluating intravenous (IV) ganaxolone*** for the treatment of
> refractory status epilepticus (RSE) following an interim analysis.
>
> ***Marinus has decided to complete enrollment in the RAISE trial at approximately
> 100 patients with topline results expected in the summer of 2024***. Those results
> will be used to determine whether to continue development of IV ganaxolone.
> Marinus remains blinded to the RAISE trial data.
>
> ***"While we are disappointed that RAISE did not meet the early stopping criteria,***
> we will only be able to determine the trial's outcome once we unblind and analyze
> the full data set," said Scott Braunstein, M.D., Chairman and Chief Executive
> Officer of Marinus. "We will also be evaluating potential cost-saving strategies to
> provide the strongest capital position as we approach enrollment completion in the
> global Phase 3 Trust TSC trial in tuberous sclerosis complex."

169.    In addition, the April 2024 Update Press Release revealed the Company was going

to begin implementing cost-saving measures, stating:

> The Company continues the successful U.S. commercial launch of ZTALMY
> resulting in preliminary unaudited net product revenue of between $7.4 and $7.6
> million for the first quarter of 2024. Marinus estimates preliminary unaudited cash,
> cash equivalents, and short-term investments of $113.3 million as of March 31,
> 2024. ***Cost reduction activities to extend the cash runway beyond the fourth
> quarter of 2024 are under review and are expected to be implemented in the
> current quarter***.

170.    On this news, the Company's stock price declined by $6.22 per share, or 82.7%,

from a closing price of $7.52 per share on April 14, 2024, to close at $1.30 per share on April 15,

2024. The following day, the Company's stock price declined by an additional $0.10 per share, or

7.7%, from a closing price of $1.30 per share on April 15, 2024 to close at $1.20 per share on April 16, 2024.

### *May 8, 2024 Form 8-K*

171.    On May 8, 2024, the Company filed a current report on Form 8-K with the SEC (the "May 2024 Announcement"). Attached to the May 2024 Announcement was a press release announcing additional cost cutting measures by the Company, including stopping the enrollment in the RAISE trial. The press release stated:

- ***Stopped clinical trial enrollment in the RAISE and RAISE II trials***[;]

- Deferred IV ganaxolone manufacturing investments[;]

- Reduced the Company's workforce by approximately 20%[;]

- Additional cost reductions across both [R&D] and general and administrative (G&A) functions[;]

- Other operational changes to increase overall efficiency of the Company's operations.

172.    In the same press release, the May 2024 Announcement also revealed that "***Marinus has stopped the Phase 3 Raise II trial in RSE***; future development in RSE will be assessed following review of the RAISE topline data[.]"

### *May 8, 2024 Fierce Biotech Article*

173.    Later that same day, *Fierce Biotech* published an article titled ""Marinus lays of 20% of staff to steady ship after IV seizure med's phase 3 struggles." The article highlighted the impact the failure to meet the early stopping criteria in the RAISE trial had on the Company, stating:

> Marinus Pharmaceuticals is implementing a raft of cost-cutting measures in the wake of last month's phase 3 struggles—***including jettisoning a fifth of its workforce***.

Employees at the Pennsylvania-based biotech may have been expecting some bad news ever since CEO Scott Braunstein, M.D., warned the company was "evaluating potential cost-saving strategies" *in April after an interim analysis of the RAISE trial assessing intravenous ganaxolone as a treatment for refractory status epilepticus (RSE) failed to meet predefined "stopping criteria*."

*Now, Marinus has revealed that the strategy will involve reducing its head count by around 20% as well as deferring its investments in manufacturing intravenous ganaxolone*. The biotech is also halting enrollment in both the RAISE trial and another late-stage study in RSE called RAISE II.

The cost-cutting won't stop there. *The company also mentioned "additional cost reductions across both R&D and general and administrative functions" as well as a vague reference to "other operational changes to increase overall efficiency of the company's operations."*

174.    On this news, the Company's stock price declined by $0.14 per share, or 8.9%, from a closing price of $1.57 per share on May 7, 2024, to close at $1.43 per share on May 8, 2024.

## SUBSEQUENT DEVELOPMENTS

175.    On June 17, 2024, the Company issued a press release announcing the topline results for the RAISE trial (the "RAISE Results Press Release"). The RAISE Results Press Release revealed that the RAISE trial ended with only 96 of the 124 anticipated enrollees. On this, the RAISE Results Press Release stated:

In the RAISE trial, patients with RSE that failed at least two antiseizure medications were randomized to IV ganaxolone or placebo in addition to standard of care treatment. The intent-to-treat population consisted of 96 patients, including 49 in the IV ganaxolone arm and 47 in the placebo arm.

Topline data demonstrated that:

- The trial met the first co-primary endpoint: A statistically significant proportion of patients had status epilepticus cessation within 30 minutes of initiating IV ganaxolone compared to placebo: 80% vs. 13%, respectively (p<0.0001).

- The trial did not meet the second co-primary endpoint: RAISE failed to achieve statistical significance in the proportion of patients not progressing to IV anesthesia for 36 hours following initiation of IV ganaxolone compared to placebo: 63% vs. 51%, respectively (p=0.162).

- The incidence of serious adverse events was similar between the treatment and placebo arms (n=19 for IV ganaxolone, n=18 for placebo), with hypotension being more commonly seen in the IV ganaxolone arm.

176.    Defendant Braunstein was later quoted in the RAISE Results Press Release, stating that "[a]lthough the RAISE trial did not achieve statistical significance on one of its co-primary endpoints, these findings provide valuable insights that will guide our ongoing research and development in our mission to bring innovative and effective treatment options to those in need."

177.    Defendant Hulihan was also quoted in the RAISE Results Press Release, stating "[w]e noted that patients were enrolled late in their course of status, with study drug initiated, on average, 38 hours following onset. This appears to be inconsistent with the urgency to initiate therapy emphasized in treatment guidelines." Defendant Hulihan then went on to express disappointment, stating that

> the imbalance in baseline characteristics between the two treatment arms, with a higher proportion of patients in the IV ganaxolone arm presenting with stupor or coma, entering the trial on mechanical ventilation, having a higher baseline status epilepticus severity score, and higher incidences of underlying disorders associated with significant morbidity and mortality, such as glioblastoma and encephalitis. We believe this imbalance confounds the assessment of potential differences in patient outcomes for IV ganaxolone compared to placebo.

178.    The RAISE Results Press Release went on to promise that "[t]he Company will continue to analyze the full RAISE dataset and plans to engage with the U.S. Food and Drug Administration to discuss a potential path forward for IV ganaxolone in RSE. Marinus expects to present the RAISE data at an upcoming medical meeting."

179.    In regard to the Company's cash position, the RAISE Results Press Release revealed that ending the RAISE trial early allowed the Company to extend its cash runway through the second quarter of 2025, namely through "the impact of cost reduction plans announced earlier

this quarter and recent amendments to" a credit agreement, and a separate revenue interest financing agreement.

## **DAMAGES TO MARINUS**

180.    As a direct and proximate result of the Individual Defendants' conduct, Marinus will lose and expend many millions of dollars.

181.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its President, CEO, and Chairman; its CFO, COO; and its CMO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

182.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

183.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

184.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the three Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $176,699 during the Relevant Period.

185.    Additionally, these expenditures include, but are not limited to, excessive

compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including payments made pursuant to the 2024 EIP as a result of the shareholders approving the proposals discussed herein.

186.    As a direct and proximate result of the Individual Defendants' conduct, Marinus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

187.    Plaintiff brings this action derivatively and for the benefit of Marinus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Marinus, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

188.    Marinus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189.    Plaintiff is, and has been at all relevant times, a shareholder of Marinus. Plaintiff will adequately and fairly represent the interests of Marinus in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

190.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

191.    A pre-suit demand on the Board of Marinus is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following six individuals: Defendants Braunstein, Ezickson, Fischer, Johnson, Mayleben, and Silverstein (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants that were on the Board at the time of the filing of this complaint.

192.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Director-Defendants caused Marinus to issue false and misleading statements which were intended to make Marinus appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

193.    Moreover, all the Director-Defendants solicited the 2024 Proxy Statement, which called for a shareholder vote to, *inter alia*, re-elect two Director-Defendants to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

194.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 EIP, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 EIP, who would not have approved the 2024 EIP, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 EIP at the annual meeting of stockholders of Marinus on May 22, 2024, the then-existing plan would have terminated in July 2024. After the shareholders approved the 2024

EIP, 4,000,000 shares were made available under the plan (plus the remaining shares from the pre-existing plan) and the 2024 EIP was effective for an additional ten years. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 EIP pursuant to the 2024 Proxy Statement. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

195.    Additional reasons that demand on Defendant Braunstein is futile follow. Defendant Braunstein has been the Company's President, CEO, and a director since September 2018. In November 2022, he was also named to be Chair of the Board. The Company provides Defendant Braunstein with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Braunstein solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Austin, Ezickson, and Johnson, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. Furthermore, Defendant Braunstein engaged in lucrative insider trading, reaping personal profits of approximately $117,789. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Braunstein is a defendant in the Securities Class

Action. Moreover, under the 2024 EIP, Defendant Braunstein is eligible to receive stock awards under the 2024 EIP, and will receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Braunstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Ezickson is futile follow. Defendant Ezickson has served as a Company director since December 2019. Defendant Ezickson also serves as the Chair of the Nominating & Corporate Governance Committee and as a member of the Audit Committee. Moreover, Defendant Ezickson solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Austin, Johnson,  and himself, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 EIP, Defendant Ezickson is eligible to receive stock awards under the 2024 EIP, and will receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Ezickson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Fischer is futile follow. Defendant Fischer has served as a Company director since December 2019. Defendant Fischer also serves as a member of the Audit Committee, the Compensation Committee, and the Commercial Committee.

Moreover, Defendant Fischer solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Austin, Ezickson, Johnson, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 EIP, Defendant Fischer is eligible to receive stock awards under the 2024 EIP, and will receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Fischer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has served as a Company director since April 2023. Defendant Johnson also serves as the Chair of the Compensation Committee and as a member of the Commercial Committee. Moreover, Defendant Johnson solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Austin, Ezickson, and himself, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 EIP, Defendant Johnson is eligible to receive stock awards under the 2024 EIP, and will

receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Johnson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199. Additional reasons that demand on Defendant Mayleben is futile follow. Defendant Mayleben has served as a Company director since December 2008. Defendant Mayleben also serves as the Lead Independent Director and as a member of the Audit Committee and Compensation Committee. Moreover, Defendant Mayleben solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Austin, Ezickson, and Johnson, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 EIP, Defendant Mayleben is eligible to receive stock awards under the 2024 EIP, and will receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Mayleben breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200. Additional reasons that demand on Defendant Silverstein is futile follow. Defendant Silverstein has served as a Company director since January 2023. Defendant Silverstein also serves as the Chair of the Audit Committee. Moreover, Defendant Silverstein solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the

re-election of Defendants Austin, Ezickson, and Johnson, allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the 2024 EIP. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 EIP, Defendant Silverstein is eligible to receive stock awards under the 2024 EIP, and will receive various amounts of stock awards under the 2024 EIP in the future, thereby materially benefiting from the adoption of the 2024 EIP. For these reasons, too, Defendant Silverstein breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on the Board is futile follow.

202.    Defendants Silverstein (Chair), Ezickson, Fischer, and Mayleben served as members of the Audit Committee for parts of or the entirety of the Relevant Period. In violation of the Audit Committee Charter, Defendants Silverstein, Ezickson, Fischer, and Mayleben failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Silverstein, Ezickson, Fischer, and Mayleben further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

203.    In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

204.    Marinus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Marinus any part of the damages Marinus suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

205.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

206.    The acts complained of herein constitute violations of fiduciary duties owed by Marinus's officers and directors, and these acts are incapable of ratification.

207.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Marinus. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Marinus, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

208.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Marinus to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

209.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

212.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

213.    Under the direction and watch of Defendants Braunstein, Austin, Ezickson, Fischer Johnson, Mayleben, Nochur, Noonberg, and Silverstein, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight functions, the Board was not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

214.    The 2024 Proxy Statement also failed to disclose that: (1) the data for the RAISE trial was messy; (2) as a result, the Company needed to expend significant resources in order to

clean it to uniformity; (3) the Company had been informed by November 7, 2023 to avoid an interim analysis due to the probability of meeting the enhanced criteria to stop the trial early; (4) to avoid this, the Company omitted any contradictory advice of senior staff as the Company did not have adequate resources to complete both the RAISE trial and the TrustTSC trial; (5) by not having adequate resources, the Company committed to end the trial at the interim analysis anyway despite knowing it would fail to meet its primary endpoints; (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 EIP; and (7) the Company did not have adequate internal controls over financial reporting. As a result, Marinus's statements were materially false and misleading at all relevant times.

215.    In the exercise of reasonable care, Defendants Braunstein, Austin, Ezickson, Fischer Johnson, Mayleben, Nochur, Noonberg, and Silverstein should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of Defendants Ausin, Ezickson, and Johnson to the Board, thus allowing them to continue breaching their fiduciary duties to Marinus, and the approval of the 2024 EIP.

216.    The Company was damaged as a result of Defendants Braunstein's, Austin's, Ezickson's, Fischer's, Johnson's, Mayleben's, Nochur's, Noonberg's, and Silverstein's material misrepresentations and omissions in the 2024 Proxy Statements.

217.    Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Marinus's business and affairs.

220.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

221.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Marinus.

222.    In breach of their fiduciary duties owed to Marinus, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the data for the RAISE trial was messy; (2) as a result, the Company needed to expend significant resources in order to clean it to uniformity; (3) the Company had been informed by November 7, 2023 to avoid an interim analysis due to the probability of meeting the enhanced criteria to stop the trial early; (4) to avoid this, the Company omitted any contradictory advice of senior staff as the Company did not have adequate resources to complete both the RAISE trial and the TrustTSC trial; (5) by not having adequate resources, the Company committed to end the trial at the interim analysis anyway despite knowing it would fail to meet its primary endpoints; (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024

EIP; and (7) the Company did not have adequate internal controls over financial reporting. As a result, Marinus's statements were materially false and misleading at all relevant times.

223.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

224.    In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's stock was artificially inflated before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $176,699.

225.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Marinus's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

226.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Marinus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228.    Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Marinus.

231.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Marinus that was tied to the performance or artificially inflated valuation of Marinus or received compensation or other payments that were unjust in light of the Individual Defendants bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

232.    Plaintiff, as a shareholder and a representative of Marinus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

233.    Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

234.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Marinus, for which they are legally responsible.

236.    As a direct and proximate result of the Individual Defendants' abuse of control, Marinus has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Marinus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

237.    Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

238.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Marinus in a manner consistent with the operations of a publicly held corporation.

240.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Marinus has sustained and will continue to sustain significant damages.

241.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

242.    Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## SIXITH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

245. The Individual Defendants caused the Company to pay for the restatement of the materially false and misleading financial statements at great cost to the Company.

246. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Marinus to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

247. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

248. Plaintiff, on behalf of Marinus, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Braunstein, Pfanstiel, and Hulihan for Contribution Under Sections 10(b) and 21D of the Exchange Act**

249. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250. Ford and Defendants Braunstein, Pfanstiel, and Hulihan are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants

Braunstein's, Pfanstiel's, and Hulihan's willful and/or reckless violations of their obligations as officers and/or directors of Marinus.

251.    Defendants Braunstein, Pfanstiel, and Hulihan, because of their positions of control and authority as officers and directors of Marinus, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Marinus, including the wrongful acts complained of herein and in the Securities Class Action.

252.    Accordingly, Defendants Braunstein, Pfanstiel, and Hulihan are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

253.    As such, Marinus is entitled to receive all appropriate contribution or indemnification from Defendants Braunstein, Pfanstiel, and Hulihan.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Marinus, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Marinus;

(c)    Determining and awarding to Marinus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Marinus and the Individual Defendants to take all necessary actions to reform and improve Marinus's corporate governance and internal procedures to comply

with applicable laws and to protect Marinus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Marinus to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Marinus restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: December 17, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ John Coyle_____*
John Coyle
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017

Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Nicholas Stebbins, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16__ day of December, 2024.

DocuSigned by:

451808C78AD94C0...

Nicholas Stebbins